Bank of Middlebury *v.* Edgerton et als.

---

THE BANK OF MIDDLEBURY *v.* JACOB EDGERTON, SENECA SMITH, MYRON CLARK, GEORGE W. HARMON AND DAVID LOVE.

[IN CHANCERY.]

*Creditor's lien.    Trustee process.    Attachment.    Railroads.*

An attaching creditor, after an agreement with the debtor and other attaching creditors not to enter his suit in court, delivered the writ, the service of which had never been completed by leaving a copy with the debtor, to the clerk near the close of the term, and the name of the general attorney of

Bank of Middlebury *v.* Edgerton et als.

the debtor was entered on the docket by the direction of the attorney for the plaintiff without any previous authority from him, though he had notice of it shortly afterwards. The suit was continued at the first term without the consent of the debtor or his attorney, and at the second term, the latter on learning the defect in the service, caused his name to be struck from the docket in that cause, after which the debtor was defaulted and an execution issued against him. *Held*, that under these circumstances the creditor had no lien upon the property attached by him.

A railroad company whose personal property had been attached and receipted by C., executed a lease to C. of all its property for a rent reserved therein, with a stipulation that C. might also hold the property as security for his liability as receiptor, and C. went into possession of the property under this lease. The orators then brought a suit at law against the company, and summoned C. as trustee, and had at the time of bringing their bill recovered judgment against the company, but their suit was still pending as to the trustee. Subsequently to the commencement of the orators' suit at law the officer who had made the original attachment of the property took it out of C.'s hands as receiptor, and at the same time attached it on the suit of other creditors of the company. *Held*, that whether the lease to C. was valid or not, the claim of the orators to the property by virtue of their trustee process was superior to that of the subsequent attaching creditors, and the officer was decreed, after satisfying the attachments made previous to the orators' trustee process, to deliver the surplus to C. who was also decreed to disclose its amount as effects to respond to the orators' judgment.

The right to build, own, manage and run a railroad and take the tolls thereon, is not of necessity of a corporate character or dependent upon corporate rights. It may belong to and be enjoyed by natural persons and there is nothing in its nature inconsistent with its being *assignable*. BENNETT, J.

APPEAL from the decree of the court of chancery. From the bill, the answers of each of the defendants and the testimony taken in the case, the following facts appeared :

In May, 1853, the Western Vermont Railroad Company failed, and numerous suits were brought against it, and all of its property was attached. Several of these suits were brought by the directors, officers and employees of the company. Previous to this time several other suits had been brought against the company, in which a large portion of its personal property had been attached by Jacob Edgerton, sheriff of Rutland county, which however had been receipted by Myron Clark. Among the suits brought at the time of the failure of the company was one in favor of Seneca Smith, their clerk and treasurer, the writ in which was served May

12, 1853, by Edgerton, by attaching, subject to the prior attachments made by him, a large amount of the personal property of the company.

In June, 1853, negotiations were entered into between the directors and officers of the company and George Barker, which resulted in an agreement that the latter should be made its president and financial manager, and that he should execute bonds to indemnify the directors and officers against the liabilities they were under in behalf of the company, which agreement was carried out by him, but he made it a preliminary condition to his agreement that all the suits brought by the directors and officers against the company should be discontinued forthwith.    This condition was agreed to by all the directors and officers, Smith among the number, and none of their suits, except Smith's, were entered in court.

On November 3d, 1853, the railroad company, by their president, Mr. Barker, in pursuance of a vote of the directors duly adopted to that effect, executed a lease of their railroad, real estate and personal property to Myron Clark, for the term of three years, at a stipulated rent, the amount of which depended upon the net earnings of the road.    By the terms of this lease the personal property was to be held by Clark as security for his liability as receiptor thereof for the company, until he should be relieved from such liability, and if taken from him on his receipts he was not to be accountable for it, and might, if he chose, thereupon avoid the lease.    Clark immediately went into possession of the railroad and all the company's real and personal property under this lease.

Immediately afterwards suits were brought against the railroad company by George T. Hodges and the orators, in each of which Clark was summoned as trustee.    Hodges' writ was served upon Clark on the 4th and that of the orators on the 5th of November, 1853.    Both of these suits had already resulted in judgments against the railroad company, but were still pending as to the trustee Clark.    The orators' judgment was for more than fifteen thousand dollars, and that of Hodges for about one thousand dollars.

On the 11th of February, 1854, a large number of the suits against the company, which were brought before its failure, had resulted in judgments for the plaintiffs, and executions having been issued thereon and placed in the hands of Edgerton, the sheriff,

for collection, he retook on that day from Clark the property which he had previously attached in those suits, and which Clark had receipted, and on April 1st, 1854, duly sold it upon these executions. From the avails of this sale all the executions upon suits brought prior to that of Smith, which was next prior to that of George T. Hodges, were satisfied in full, except one in favor of J. H. Vail, and one in favor of Silas H. Hodges, both amounting to about one thousand dollars, and there still remained in Edgerton's hands from the proceeds of this sale, the sum of five thousand eight hundred and thirty-nine dollars and fifty-eight cents.

Smith's writ was made returnable at the September Term, 1853, of the Rutland county court. No copy of this writ, with a description and list of property attached, was ever delivered to the railroad company, and this omission was not the fault of Edgerton, as Smith took the writ out of his hands on the 16th of May, 1853, before he had completed the service, and Edgerton had supposed that the suit was abandoned by Smith until after the commencement of the term to which it was returnable. Edgerton did not have the writ after May 16th, 1853, until the 17th of November following, when it was brought to him by Smith, at whose request he made his return which merely set forth the attachment of the personal property, without mentioning any delivery of a copy of the writ to the railroad company.

At the September Term, 1853, the Rutland county court, after sitting more than two weeks, took a recess from the 30th of September to the 14th of November, 1853. Smith's suit was not entered on the docket earlier than two or three days before the 30th of September, and the entry was then made not from the writ itself but from a slip of paper handed the clerk by E. Edgerton, Esq., who directed the clerk to set down the name of H. Edgerton, his son, as attorney for Smith, and that of Harmon Canfield as attorney for the railroad company, and also to enter the suit as continued without the appointment of an auditor at that term. The writ in Smith's case was made by the firm of Edgerton & Allen, of which E. Edgerton was a member, and their names were at first indorsed upon the writ as the plaintiffs' attorneys. Edgerton & Allen and Harmon Canfield were then the general counsel for the railroad company in all their suits in Rutland

county, but E. Edgerton had no previous authority from Canfield to enter his name for the defendant in Smith's suit. The writ itself was not delivered to the clerk until some time in the November adjourned Term. Canfield was informed by E. Edgerton after the 30th of September, that the suit was entered and that Canfield's name had been placed upon the docket as attorney for the railroad company. But he was not in court during the September or November Terms after the entry of the suit upon the docket, neither did he give his consent to the continuance of the case without the appointment of an auditor. During the winter of 1853–4 Canfield first learned of the defect in the service of Smith's writ, and at or before the March Term, 1854, he directed the clerk to strike his name from the docket in that suit, which was accordingly done, and at that term the railroad company were defaulted, auditors were appointed and the case continued. At the hearing before the auditors, Canfield appeared for the railroad company, but protested against their proceeding with the case on the ground that it was not properly in court. At the March Term, 1855, the suit resulted in a judgment against the company for eight thousand and forty dollars damages and costs, on which an execution was taken out and placed in Edgerton's hands in season to charge the property attached, and Smith had given Edgerton directions to apply the balance in his hands towards the payment of the execution.

It also appeared that George W Harmon and David Love had brought a joint action, and David Love a several action against the railroad company, to secure debts which the company owed them. The writs were placed in Edgerton's hands on the 11th of February, 1854, and by the directions of the plaintiffs, at the same time that he took the property out of Clark's hands as receiptor on the former attachments, he attached the same property upon these writs. These suits had both resulted in judgments for the plaintiffs for over five thousand dollars and nine thousand dollars respectively, and executions had been issued thereon and placed in Edgerton's hands in season to charge the property, with directions to apply the balance remaining in his hands towards the payment thereof.

The orators claimed in their bill that Smith's judgment was void and that their lien upon the property of the railroad company was

prior and superior to that of Harmon and Love, and also to that of Love, and prayed for an injunction against Smith, Harmon, Love and Edgerton from taking any steps towards the collection of Smith's, Harmon and Love's or Love's executions out of the surplus in Edgerton's hands or the property in Clark's possession, and also that Edgerton should be decreed to satisfy Silas H. Hodges' and Vail's executions out of the surplus remaining in his hands, and to pay the balance over to Clark, and that Clark should be decreed to disclose the amount of such balance and the property in his hands as effects to respond to the judgment of the orators, subject to his own rights and the claims of George T. Hodges, and for further relief, etc.

The chancellor dismissed the bill *pro forma,* and the orators appealed.

*Charles L. Williams* and *E. J. Phelps,* for the orators.

*George W. Harmon* and *E. N. Briggs,* for the defendants Harmon and Love.

The opinion of the court was delivered by

BENNETT, J.   Upon the facts which the testimony in this case clearly establish, there is no good ground to claim that Seneca Smith has a *lien* upon the funds in the hands of Sheriff Edgerton for the satisfaction of his judgment against the railroad company; and indeed he has not appeared before this court to vindicate his claim.   It is apparent from the testimony, that Smith, in connection with other attaching creditors of the railroad company, entered into an arrangement with the directors and the other officers of the company by which their suits against the company were to be discontinued, and this was expressly required on the part of Mr. Barker as a *sine qua non,* before he would consent to make any negotiation in behalf of the railroad company to aid them in giving them relief from their financial embarrassment, and this was in fact done by all the attaching creditors, save Mr. Smith.   None of the other creditors attempted further to prosecute their suits against the company.   It is not improbable that Smith may have entered into the arrangement in good faith and have intended to carry out

the arrangement on his part, but, for some cause, subsequently changed his views.

The service of Smith's writ had never been completed by a delivery of a copy to the railroad company as required by the statute; and this was not through the neglect of the officer, but through the direct agency of Smith himself. The writ was not in fact returned to the court at that term to which it was made returnable, and when the suit purported to have been entered in court. The officer's return upon the writ was not, in fact, made until the November following the return day in the writ.

The appearance of Mr. Canfield, at the term to which the writ was made returnable, for the railroad company, was through the procurement of the attorney for Mr. Smith, who acted without authority from the company, and was repudiated by Mr. Canfield as soon as he became acquainted with the facts in the case. Although he appeared before the auditor in taking the accounts, yet it was with a protest as to the right of Smith to proceed in the matter. To hold that Smith is, under all the circumstances, entitled to enforce a *lien* upon the property attached, would be to enable him to commit a gross fraud, not only upon the officer but upon all who were interested in the arrangement by which the suits were to be discontinued. The proceedings of Smith are so irregular and so far tainted with fraud, that a court of equity cannot allow him to set up a *lien* to the funds in the hands of the sheriff that can override the equities of the orators.

The more important question in the case arises between the orators and Harmon and Love, and the question is which has the superior equity to the funds in the hands of the sheriff. Harmon and Love on their joint account, and Love on his individual account also on the 10th of February, 1854, issued their writs against the railroad company, which were served on the next day by attaching the property of the company, subject to certain other prior attachments. The trustee suits in favor of George T. Hodges and the Bank of Middlebury were served upon Clark, the trustee, as early as November, 1853. No conflict arises as to the rights of the sheriff under *prior* attachments, and the rights of Clark under his lease, but it is claimed by Harmon and Love that the trustee suits in favor of George T. Hodges and the orators can have no

effect against their attachments, although prior in time. Judge Clark was in the possession of the railroad property under his lease, and as a receipt-man, at the time the trustee writs were served upon him. The statute enacts, "that every person having any goods, effects or credits of the principal defendant intrusted or deposited in his hands or possession, may be summoned as a trustee, and such goods, effects and credits shall thereby be attached and held to respond the final judgment in the suit."

No question can be raised but what the statute is broad enough to include the property of the company in the possession of Clark, and we see no good reason why it may not be attached in his hands by means of the trustee process, subject to all such *liens* as were upon the property at that time. In the case of *Brown* v. *Davis and Trustee*, 18 Vt. 211, it was held that articles of personal property in the possession of the trustee might be charged by the trustee process, although the property was in all respects open to the ordinary process of attachment, and in a case too, where the person sued as trustee had no claim to, or *a lien* upon the property. To hold this is not locking up the property from the reach of other creditors. If there was likely to be a *surplus* it might be reached by a subsequent trustee process, and in *Burlingame* v. *Bell*, 16 Mass. 322, it was held that goods charged by a trustee process might be specifically attached in the hands of the trustee on other debts, and the officer would hold them subject to the claim of the trustee arising from the service of the trustee process upon him, and in *Rockwood* v. *Varnum*, 17 Pick. 293, the right of the trustee to retain the custody of the goods against any one who shall attempt specifically to attach them, was fully recognized. Though the property at the time of the execution of the lease to Clark was heavily encumbered by attachments, yet the general property remained in the railroad company, and they might make a valid sale or assignment of it, subject to all *liens* then upon it which had been created by prior attachments. See *Whipple* v. *Thayer*, 16 Pick. 25, and *Marshall* v. *Town*, 28 Vt. 14.

In the case before us, Clark, having become responsible for the property to the officer as a receipt-man, on the previous attachments, had the actual possession of the property after the execution of the lease by the railroad company, as against the company

under the lease, and also had his rights at the same time as a receipt-man.

It has been said in argument that the lease to Clark was void; but if such was the fact, we do not see how that could better the condition of Harmon and Love. He would still be in the possession of the property of the company, and though it might be specifically attached, yet that would not preclude the right to attach it by the trustee process. But we see no valid objection to the validity of the lease to Clark. It is not necessary in this case that we should hold that the *franchise* to this company, to be a corporation, is a subject of sale or transfer. The right to build, own, manage and run a railroad, and take the tolls thereon is not of necessity of a corporate character or dependent upon corporate rights. It may belong to, and be enjoyed by natural persons, and there is nothing in its nature inconsistent with its being *assignable*. See *Peter* v. *Kendall*, 6 B. & C. 703, Comyn's Dig., title, Grant. C.

The vote of the directors of the 2d of November, 1853, was in every way ample to confer the power upon Mr. Barker, the president of the company, to execute the lease to Clark, and it gave him the right by implication to affix to the lease the corporate seal.

Though the sheriff might have had the right to retake the property from the possession of Clark, his receiptor, by reason of his prior attachments, yet this is no reason why (the general property remaining in the railroad company,) a further *lien* might not be acquired on it against the company, subject to all prior *liens*, and we have no doubt the trustee process was an appropriate proceeding to reach the *surplus* in the hands of Clark, subject to his rights as a lessee, and also as a receiptor of the property on the prior attachments, and indeed it may well be questioned whether this was not the only method by which the surplus in the hands of Clark could be reached. The trustee, Clark, holds the *surplus* for the attaching creditors in the trustee suits, and when the prior specific attachments have been satisfied by the sheriff out of the property, it is his duty to restore any surplus which shall remain to Clark, that he may hold it subject to his rights as lessee and his liabilities as trustee, by means of the trustee suits against him.

The result then, must be, that the decree of the chancellor, which appears to have been *pro forma*, is reversed, and the cause

remanded to the chancellor, with directions that he pass a decree that the defendant, Jacob Edgerton, be allowed to retain in his hands, out of the avails of the sale of the property, a sum sufficient to satisfy the *liens* of J. H. Vail and Silas W. Hodges on the property, by means of their attachments and judgments, etc., against the railroad company; and that after retaining for any just claim which he may have on the trust funds in his hands for taking charge of the same, he pay what shall remain, including such interest as he should be charged with, into the hands of Myron Clark, that he may hold the same to pay and satisfy the claims which George T. Hodges and the orators may respectively have upon the funds by means of their suits against the railroad company and said Clark, as their trustee, in their due order, as the proper court shall award and direct, so that the said Clark may be fully indemnified for his liability as such trustee; and if need be, a reference may be had to a master to ascertain the sum to be paid by said Edgerton to said Clark, and that the orators pay to said Edgerton and to Clark the costs of their several answers, including counsel fees for drawing the same, to be taxed by a master; and that said Seneca Smith be dismissed without costs, and under an order that he pay to the orators their costs on the original bill, including also the costs taxed against the orators in favor of Clark and Edgerton; and that Harmon and Love be dismissed without costs, and that they pay to the orators their additional costs, occasioned by the means of their supplemental bill, all which are to be taxed by a master.