JAMES R. LANGDON AND OTHERS *v.* VERMONT & CANADA RAILROAD CO. AND OTHERS.

## [IN CHANCERY.]

This is essentially the third hearing, and third decree in the same cause. In the 50th Vt., it was decided and announced, "that the expenses of the receivers and managers properly incurred are to be paid before the beneficiaries of the trust are entitled to partake of the earnings." In the 53d Vt., it was decided that a court of equity would charge the property, the subject of the receivership, on behalf of the *bona fide* creditors of the trust, with an equitable lien, and cause the property to respond in payment ; and that this claim was superior to rights under the contract of lease or the mortgages.

This equitable charge does not arise from, or depend upon the contract relation of the parties, but, solely from the act of the court. The court by its prerogative right and power, seized the property, which was the subject of controversy.

The managers of the property were the instruments of the court ; and their possession that of the court. The property consisted of two railroads, each having its separate entity and franchise, but so bound together in perpetual covenant, that they were essentially one road·; the Central owned the whole line of roads, subject to the claim of its own mortgage-bondholders, and the rent-claim of the Canada road, which was a first charge upon both roads.

The property of the Central was its roads, subject to certain fixed burdens. The property of the Canada was a leaseho'd estate.

Whether the managers were, in fact, the "managing agents" of the primary parties, or, strictly, instruments of the court, yet as they acted as court managers, and were held out as such by all the parties, in contracting the debts, and issuing and negotiating the bonds, the actors cannot be permitted to draw in question, the character in which they acted; and the property voluntarily put into the enterprise, is subjected to liability for all debts thereby incurred.

The perpetual right of the Canada to a fixed semi-annual income from the working of this line of roads, as a property available to pay debts, is the *corpus* of its estate. If income is to pay the debt, it is to absorb income till the debt is paid. If the debt is larger than the value of the leasehold, then rent is postponed indefi-

38

nitely, which, in effect, extinguishes the latter, which works out the same result as subjecting the property to a redeemable charge, and avoids a perpetual trust.

Some part of the opinion in the 50th Vt. misconstrued, and in a measure perverted.

The opinion explained.

The business of the managers was administrative; not to be "wound up," but continuous in its character, and requiring large expenditure from day to day.

The duties of such managers, as common carriers, are largely to the public; and a continuous call for the exercise of judgment, in occurring incidents of vital interest to the property, and the public, which cannot be postponed nor evaded. The exactions which the law makes in such cases upon managers are modified by reason and justice as applied to the character of the trust.

The circumstances of the property at the time of the "compromise" decree of 1864 stated.

The Canada must complete its road.

To raise necessary funds the Canada must issue new stock, which largely increased the first burden, and postponed the mortgages.

Act of the Legislature authorizing the court of equity to adjust the matter as "should be just and equitable." The decree of the court is judicial.

The court had lawful jurisdiction of the parties and the subject-matter, and no error of procedure or of administration could oust it of jurisdiction.

The court had the judicial hold of the property from the time receivers were appointed in 1861, until the present time. It had the judicial power to appoint the Central Vermont R. R. Co. manager.

If there was error in the exercise of its discretion, the order was valid till set aside. This could be done on petition, and in vacation.

The court may pass a final decree as to ascertained debts, and retain the bill for enforcement of further liens thereafter to be proved and established. In this case the Central Vermont R. R. Co. should have been retained as a party, and all that have been in the management of the trust shou'd have their accounts settled, and equitable offsets ascertained and applied.

It is the fault both of the managers, and of the parties, that such accounts have not been settled.

The equipment cannot be severed from the working operations of the roads without detriment to the property. The amount and value of the special securities in equipment and its income hereafter to be ascertained and applied.

The eight per cent. interest specified in the bonds not usurious.

The bonds purchased by the managers at a discount, if the property is redeemed, not to be enforced for more than was paid, and interest as specified in the bonds.

The floating debt, and the Grand Trunk R. R. claim, a lien on the property, but whether superior to other debts, not now determined.

The payment of $1000 for the benefit of a reading room, a proper charity, not a legal accounting for trust funds.

This equitable charge may be enforced by foreclosure. In settling the accounts, the court will be governed by the legal rules applicable to the managers of an administrative trust, as modified by the consent and agreements, actual or constructive, of the parties in interest.

For the facts in this case see 53 Vt. 228–278. The case was continued and heard before the full bench at Montpelier, May, 1882.

The special masters found, among other facts :

" The Central Vermont Railroad Company presented a claim for money originally advanced by it (leaving the matters in relation to the discharge of the duties of its trust and its relation to other roads for adjustment in settlement of its account), for the sum of $681,378, and interest thereon to July 1, 1881, $273,-674.14, making a total of $955,052.14. . This claim stands in open account, as shown by Exhibit J, and the interest has been computed at the rate of six per cent. on the balance due at the end of each six months for the succeeding six months, as shown by Exhibit I.

Although large debits appear upon Exhibit J, they grow out of the manner in which the money was advanced, and are entered upon the books to show accuracy in the transactions.

The claim is for money advanced by the Central Vermont Railroad Company for the purposes of the trust, pursuant to the decree whereby said company was appointed receiver and manager; and the money was appropriated largely to take up the paper of the former managers, which had gone to protest.

.    .    .    .    .    .    .

The present floating debt is substantially the same floating debt that existed in September, 1872, except as it has been reduced in amount and changed hands. That is to say, in 1872 the floating debt of the trust was upwards of $2,800,000. That identical debt has been reduced to about $60,000 by payments out of the general treasury of the trust. The present floating debt, not including the debt of the Central Vermont Railroad Company, is about $1,000,-000. By reason of the reduction of the former floating debt as aforesaid, it became, and was necessary for the managers to borrow money to pay supply bills and pay rolls; and the money thus borrowed constitutes the present floating debt. If the former floating debt had not been reduced as aforesaid, out of the general treasury, there would have been no necessity of borrowing money for the purposes named.

In this sense, the present floating debt is substantially the same debt as the former floating debt. Except for the creation of the present floating debt in the form it is now, the former floating debt, assented to by the Vermont & Canada Railroad Company, the Vermont Central Railroad Company, and its first and second mortgage bondholders, would have been in existence to the amount of the present floating debt. ·

The solicitor for the Vermont & Canada Railroad Company gave notice before us, that said company would object to the allowance of any claim in behalf of the Central Vermont Railroad

Company as a corporation, until its accounts as manager of the trust were adjusted.

We find the Central Vermont Railroad Company has acted prudently, and in good faith, in respect to the use of the earnings of the roads and their equipments, looking to the best interests of the entire trust and the whole property, although the earnings of the roads and equipment since the spring of 1876 have been appropriated to the payment of floating debt, rents and running expenses of the roads. . . . .

On January 31, 1876, the Central Vermont Company, as receiver and manager, was indebted to the Grand Trunk Company on account of traffic balances accruing as aforesaid, in the sum of $334,914.12, to which interest was added from said last-mentioned date to the 30th day of June, 1876, $9,698.74, making in all the sum of $344,612.86. On July 2, 1876, the Grand Trunk Company drew its five drafts on the Central Vermont Company, as receiver and manager, at three, four, five, six and seven months date, respectively, for said last-mentioned sum, with $10,336.46 added for interest at seven per cent. discounted on said sum, making in all the sum of $354,949.32, which said drafts the Central Vermont Company, as receiver and manager, duly accepted.

These drafts were retired at maturity by renewals, and so, from time to time until the present, the interest on all but the first drafts being paid in cash. There are now outstanding eleven drafts for this original indebtedness, which the Grand Trunk Company put in evidence before us.

. . . . . .

On December 31, 1880, the Central Vermont Company, as receiver and manager, was indebted to the Grand Trunk Company in the further sum of $213,024.37 for traffic balances accruing as aforesaid in the months of December, 1876, and January, 1877, and November and December, 1877, for which no acceptances have ever been given, but which remain matter of charge on the books of the Grand Trunk Company, and on which $10,000 were paid on June 27, 1881, leaving due thereof September 13, 1881, computing interest thereon at the rate of six per cent. per annum, the sum of $211,959.82.

During all the time covered by these transactions, by the law of Canada, six per cent. per annum has been and now is the legal rate of interest in all cases where, by agreement of parties or by law, interest is payable and no rate has been fixed by the parties

nor by law; but any person or persons may stipulate for, allow and exact, on any contract or agreement whatsoever, any rate of interest or discount that may be agreed upon.

The bond for one thousand dollars proved by the Vermont Central Library Association was given to said association to enable and encourage it to fit up the reading room of said association with papers and magazines, and to make it attractive to the employes of the road, for whose benefit it was intended. The trustees thought if said employes could be induced to spend their evenings in reading rather than at saloons and other places of public resort it would be a good investment. This was the only consideration of the gift."

*B. F. Fifield, George F. Edmunds, Daniel Roberts, L. P. Poland,* for the orators.

*A. F. Walker, F. A. Brooks, W. G. Shaw, E. J. Phelps,* for the defendants.

*Edwards, Dickerman & Young,* for the Grand Trunk R. R. Co.

*James C. Barrett,* for Worcester Safety Deposit and Trust Co.

The opinion of the court was delivered by

REDFIELD, J.   This case, in essence and principle, comes now before the court for the third time; but has been presented and treated during the argument as if nothing yet had been decided, and nothing done by the court. It is certain that many *words* have been spoken by the court, many pages printed. The magnitude and anomalous condition of the case, and the immense amount of property at stake, is perhaps a full apology and explanation. All the minute detail of facts, both historical and otherwise, are fully and carefully stated by Judges BARRETT and ROYCE, in their opinions reported in the 50th and 53d Vermont; and it is not deemed needful that they should be repeated here.

In the 53d Vermont this court decided and announced, that: "As between the *bona fide* holders of the bonds so issued, and those that have been exchanged for them, and the Vermont Central Railroad

Company, the mortgage bondholders, and the Vermont & Canada Railroad Company, the former have the superior right, and must be first paid." In other words, it was decided that a Court of Equity would charge the property, which was the subject of the receivership created by the court in 1861, in behalf of the *bona fide* holders of such bonds, with an equitable lien, and cause it to respond in payment of such debts, and that this equitable charge upon said property was and should be held superior to the antecedent rights or claims of any parties growing out of the contract of lease or the mortgages. So far the law of *this case* has been established. But it is said the court below erred in making this equitable charge upon the *corpus* of the property, rather than upon its *income*, as provided by the lease. This legal question has not been decided by this court, and has been properly discussed at the bar in this hearing. It should be observed that this equitable charge does not arise from, or in any way depend upon the contract relations of the parties, but arises solely from the act of the Court of Equity. The court, by its prerogative right and power with the parties, and the subject-matter of controversy within its jurisdiction, lays its judicial hand upon the *property*, which is the subject of claim and controversy, and brings into court and holds, controls and administers the property. The receiver or manager of such property is the agent, or rather instrument of the court ; the possession and acts of such instruments are the possession and acts of the court. What was the property thus seized, possessed and administered by the court ? The Vermont and Canada Railroad and the Vermont Central, each having its corporate entity and franchise, were so bound together by mutual and perpetual covenant that they had become one road. The Vermont Central road was the owner of the whole line, including the two roads, subject to certain rights and interests in the property of its mortgage bondholders, and the rent-claim of the Vermont and Canada road. The Vermont and Canada Railroad held and owned the right to a fixed annual rent, as a first charge on the income arising from the use of said line of roads, and a right to compel the application of such income in extinguishment of such rents, in case they were in arrear. The property of the

Vermont Central Railroad was its *roads* and incidents, subject to certain fixed burdens. The property of the Vermont and Canada was a *leasehold estate*, and susceptible of valuation and alienation, like other property. If it was a leasehold estate in land, it might be seized, appraised and set off on execution, to pay the debt of a creditor, like other property. It was said by this court, BARRETT, J., in the 50th Vt., and repeated by him in the 53d Vt., that: " We do not understand it to be controverted that the expenses properly incurred are to be paid before the beneficiaries of the trust are entitled to partake of the earnings ;" that: " their office (receivers and managers) as such, embraced the *roads and railroad property* as fully and effectually as it did the *income* realized from the use of said roads and property." 50 Vt. 544 ; again, page 574 : " It was designed by the decree, and it has been the purpose of the administration under it, and such has been the substantial result, that *all* the property embraced in the original receivership, under the mandate of the Supreme Court, should be *pooled* (to use a modern term), and placed in the management of those who had been receivers under the mandate, to be thereafter held and managed in the interests of all concerned, according to the agreements from time to time of the parties in interest. That administration was going on for the behoof of the *primary parties*. It was, therefore, according to this reasoning, essentially a *trust* administration of property and its income for the behoof of the primary parties." It was the administration of a property " pooled " for a common purpose, in which administration there were, necessarily, large daily expenses to work out specified ends, " by managing agents," appointed at the instance of the primary parties. And whether they were strictly the managing agents of the primary parties, or the agents and officers of the court, with enlarged scope of *administration* accorded to them by the court, at the instance and *request* of all the parties in interest, is not of importance here to discuss. This court have held, and now hold, that the primary parties *subjected the property* which they put into this enterprise to a direct liability for the debts legitimately incurred in the *administration*. The general doctrine upon this subject was stated with point and clearness by

BARRETT, J., in *Rensselaer & S. R. R. Co.* v. *Miller & Knapp*, 47 Vt. 146. " The expenses of a trustee in the execution of a trust are a lien upon the estate ; and he will not be compelled to part with the property until his disbursements are paid. Perry 909 ; Hill 578. If the trust fund is insufficient for such reimbursement he may call upon the *cestui que trust*, in whose behalf and at whose request he acted, and recover of him personally compensation for the time and trouble and money expended. Trustees have an inherent equitable right to be reimbursed all expenses which they reasonably incurred in the execution of the trust, and it is immaterial that there are no provisions for such expenses in the instrument of trust. If a person undertakes an office for another *in relation to property*, he has a natural right to be reimbursed all the money necessarily expended in the performance of the duty. Perry, 910." It is said that no decree can be made charging the burden of those debts upon *income* or the *corpus* of the property, because of the statute of frauds and the statute of conveyancing ; and because it is an attempt to seize property " without due process of, law." If a man buys a farm in whole or in part with his neighbor's money, and takes a deed of it to himself without conveyance or a scrap of writing, a Court of Equity, to use Mr. Colby's terse expression, " will tear the seals off the deed," and charge the farm and conscience of him who holds the title, with a trust, and compel him to return the money or the title. If a purchaser of land omits to pay the purchase money, a Court of Equity will charge the property with a lien for the unpaid purchase money ; and by foreclosure compel the payment of the purchase money or to extinguish the title to the property. *Manly* v. *Slason*, 21 Vt. 271. Ib. 28 Vt. 346. This is now regulated by statute. The same is true of an equitable mortgage by a deposit of the title deeds, well known in England.

It therefore being assumed, as we think it must be, that expenses of administration must take precedence of, and postpone the application of income to the rent-claim of the Vermont & Canada Railroad, and all the claims arising from the contract relation of the parties, it follows that such precedence must, of course, postpone the application of *income* to *rent* until such debts

are *fully paid*. If such " trust debts" are more than the value of this leasehold estate, then the application of income to rent must. be postponed *indefinitely*, which in fact extinguishes the title of such leasehold estate. If such leasehold property were in *land*, a creditor under our statute would appraise the value of such leasehold, and if the debt were less than the entire value, then the officer would set off a *section* of such leasehold property, *i. e.* the title to it for a term of years, or for so long a time as that the rents will pay the creditor's debt. If the debt was more than the appraised value of the leasehold estate, then the whole estate is set off, and the creditor invested with the title. If the creditor may rightfully absorb the income of the roads indefinitely, to the exclusion of the Canada, then the estate of the Canada correspondingly ceases to be of value, and all benefit of it or in it is transferred to the creditor ; and is there any technical dogma in a Court of Equity that would require a perpetual trust administration of railroads, in order to work out the *same result* that otherwise might be speedily done by making the equitable charge " redeemable," and foreclosure ? It is the special province of a Court of Equity to cut through the meshes of form and reach results by a summary method, and in a direct line. The property with which we have to deal consists of two railroads bound together in a perpetual covenant, securing to the Canada a rent charge for all time. This perpetual right to rent, as a property available to satisfy a debt, is its entire estate. And when it is said this equitable lien cannot be made to rest on the *corpus* of the Canada, it can mean only that a court cannot make it a charge or lien upon the rent charge of the Canada, its right to receive rent, which is for all practically available purposes, the *corpus* of its estate. This saying that the right exists in the creditor to be reimbursed, " and that expenses properly incurred are to be paid before the beneficiaries of the trust are entitled to partake of the earnings," but the court are without power to enforce it, is simply denying all remedy for a conceded right. It is fundamental that where a right exists the law is adequate to protect it; where a duty rests upon one the law is adequate to enforce it. It is said in behalf of the Canada, if this is made a charge upon the *corpus*, and it is

compelled to redeem or forfeit its estate, " it sweeps away our entire property." Is this not exactly so, in substance and in fact, if these trust debts are made a charge on income superior to the lease right of the Canada? In the one case the property is subjected to a redeemable charge and lost by the refusal to redeem. In the other case the whole property is transferred to the creditor by the like refusal to pay the debt, but by creating a perpetual trust to receive the income of the property, the same result is reached by somewhat different methods. The Vermont Central omitted to pay rent to the Vermont and Canada Company. The Canada Company brought this bill to enforce their lien upon both roads as security for their rent under the contract of 1850, and asked for the appointment of receivers and managers. Receivers and managers were appointed upon their application, and both roads were seized and taken possession of by the court. It is difficult to see how either company can get their roads out of the possession of the court without paying the receivers' debt ; and if they will not pay it, the court may enforce the lien which the law gives for such a debt upon the property thus in its possession, by the ordinary remedies known to the law. Nor do we think it strange that such property voluntarily " pooled " and put to hazard, in an enterprise requiring great outlay and the creation of immense debts, should be overwhelmed in bankruptcy, and finally lost. Such is a common fate.

There seems no reason to doubt that the managers and parties in interest acted in good faith, and felt the necessity of some arrangement to increase the income of the roads in 1864 and subsequent years. The rent of the Canada road had become largely increased by the issue of new stock, made necessary by the requirements of its charter. The income was inadequate to meet current and accruing burdens on the property, and a large outlay for new equipment and the leasing of other roads to avoid ruinous competition, and borrowing large sums of money on the security of the trust property, with large interest, seemed the only way to reach adequate income.

It is claimed, that after the compromise decree of 1864 there were no receivers or managers that were in any sense officers or

instruments of the court, and that in fact there was no judicial control or possession of the property; and that this was so decided in the opinion reported in the 50th Vt.

We think that opinion has been misconstrued and in some measure perverted. The case was a petition in the old cause for an order for peremptory sale of the railroads and equipments, and all the property that had grown up in the twenty years administration of the trust, and the expenditure of vast sums of money.

The proof of *consent*, under which the debts were created against the mortgage bondholders, was *constructive* and by *representation*. They had no corporate or organic unity, and would, in all probability, be crushed out in the forced sale of such vast property.

The petition was addressed to the judicial discretion of the court, and was not like an original bill, wherein, by its flexible nature, the court could deny the specific relief sought, but grant other and different reliefs, graduated to and modified by the facts shown in the proof. But in that case, a petition for the sale of the property, the relief asked must be *granted* or *refused*.

It appeared in evidence, that since the compromise decree of 1864, great debts had been created in the administration of the property, at the instance and by the request and agreement of the parties in interest.

This was done to increase the income from the working of the roads, but had turned out an improvident expenditure and unexpected burden to the parties in interest. It was not a calamity that came upon the property by casualty, or from the inherent quality or character of the property itself, or from a strict court administration of it; but it arose wholly from the improvidence or indiscretion of the parties in interest.

The court thought the property ought not to be " wiped out " upon the instant; and that the parties in interest should have opportunity to marshal the property, and save a remnant, if possible. And the court, in the exercise of its judicial discretion, adjudged that it would not order a sale of the property.

Among the cogent and controlling reasons that moved the court to this determination, was the fact that an enormous debt had ac-

crued in the administration of the property by court-receivers and managers, solicited and agreed to in all its details by the owners of the property, in form at least, under the order and sanction of the court; that the mortgage bondholders were without capacity for organized action, yet were bound to such consent and agreement by imperfect representation, acquiescence and partaking of the fruits of such administration; yet in a sale of the property, possibly for less than half its value, such bondholders would be barred, by their very condition, from fair and equal competition in the purchase of the property.

This condition of things was a cogent, if not conclusive reason, why the burden upon the property should be made "redeemable," and that the court should not, in its discretion, resort to the harsh, and in this jurisdiction, unusual method of sale.

These reasons why the court refused to order a sale, were amplified and expressed in various forms, and in vigorous language, by the learned judge who gave the opinion.

The form of expression, the order and method of illustration in reasoning upon a legal proposition, must necessarily be that of the judge who draws up the opinion. As applied to the case in hand, it was an able and thorough exposition of the reasons why the court declined to order a sale. But the court did not negate a judicial possession and custody of the property, after the decree of 1861, but did expressly reserve that question in the published opinion. The court say: "At this time, and for purposes at present to be served, we do not deem it necessary, nor perhaps proper, to be more specific in assigning character and legal quality to the persons having the office of management since the compromise decree, than to call them *managing agents*, leaving for *future determination* the legal *quality* of the officers and the legal effects of their acts."

Whether the managers were managing agents of the parties in interest, or of the court, in the administration of the property and incurring of these liabilities, this court have held that as they acted in that character, and having been treated by the primary parties and the court as court managers, in faith of which debts were incurred and their bonds as such negotiated and sold, upon

principles of well-settled law and moral justice, the actors in such transactions cannot now be permitted to draw in question the *character* in which they acted, or claim that their negotiation and agreements were not in fact what they seemed to be; and this would be so if they acted in the most perfect good faith, and supposed the managers were the officers of the court, until they inferred otherwise from the published opinion in 50 Vt., even if such inference were the correct one. *Loulcs* v. *Kenniston*, 50 Vt. 116. It may not be important in this cause whether this was a *court management*, or whether the parties acting and in interest have so conducted that they cannot now be permitted to draw that fact in question. Yet in regard to *outside* transactions, not legitimately connected with the property and its administration, committed to the managers by the decree of 1861, the enquiry may be important.

The business in this case was necessarily administrative; the operating of railroads is a thing, in its nature, *continuous* and without limitation; requiring in the operation large expenditures from day to day. The *duties*, also, of such managers, as *common carriers*, are largely to the public as well as to the parties in interest as owners.

It is not in its character-and incidents like a receivership in an insolvent partnership, or other like business, where the only duty of the receiver is to marshal the assets, pay a dividend to the creditors, and close out the business.

The latter are more properly denominated *receivers ;* the former, *managers*, and a wider discretion must be allowed them, because at every moment in the administration of such a trust there is a demand for the exercise of *judgment*, in occurring incidents of vital interest to the property and to the public, that cannot be postponed nor evaded.

The exactions, which the law makes in such cases upon court managers, are modified by reason and justice, as applied to the nature and character of the trust. *Davis* v. *Gray*, 16 Wall. 203.

There are certain outlying facts connected with the compromise decree that should be noted. In the progress of time it had become fixed that the *Canada* road must be constructed to High-

gate and Burlington, in accordance with the requirements of its charter; and this *necessity* threatened its chartered existence. This required the raising and expenditure of a large sum of money. This was not a necessity brought upon the property in the course of administration, but was an incident inherent in the charter. Neither the court nor the parties in interest had the money, yet *provision* must be made for building the roads.

It was suggested, as the duty was upon the *Canada*, that additional stock in that corporation should be issued to raise a fund to complete its road. This involved a large increase of the rent of the *Canada*, and a corresponding postponement of the mortgage securities. The parties came into consultation. An act of the legislature was procured, authorizing the further issue of stock, and authorizing the Court of Chancery, in which the cause was pending, to issue and distribute such stock " as it *should adjudge was just and equitable.*"

The parties in interest presented a scheme to raise the necessary funds, allowing some benefits to the mortgage bondholders in compensation for the increase in rents, which was the first burden upon the property; and all parties and interests having full notice, the court found from the evidence that " it being made to appear to the court here that the matters stated in the said petition are true, and that the carrying the adjustment set forth in said petition into effect will be just and equitable to all parties interested in said roads and property, therefore, ordered, adjudged and decreed," etc. The new roads to be built were simply *accretions* to the corporate property and franchise of the *Canada* road.

The adjustment of controversies that had sprung up was for the interest of the property and in the line of duty.

The court ordered that the " cause in which the petition was filed should be continued on the docket, and any party in said cause should be at liberty to apply to this court, from time to time, for further orders in the premises."

It is not easy to see anything in that decree, under the act of the legislature, that was *extra judicial;* or that a court might not

do in the exercise of its judicial prerogative in the case in which the managers were appointed.

No provisions were made for the *future administration* of the property in any way different from preceding methods ; but the managers were left in the custody and control of the same property, with its accretions, originally committed to them under the order of the court, and under the same duties and requirements.

It is called a " compromise decree" ; and it is argued that it has no more binding force than a mere *contract* of the parties. But it should be noticed that the managers had been in custody of the property, by a decree of the court in an adversary proceeding, for many years; and this was a mere act of *procedure* in the *administration* of the property. Does the mere fact that the parties in interest consent and agree that a *method* of *procedure* in the administration of property by receivers or managers, is beneficial to the property, render a decree of the court in the premises a simple *contract* of the parties, and without *judicial* quality ?

If parties are properly impleaded, and consent to a decree or judgment, that decree or judgment is as conclusive upon the parties as if the litigants had wrangled over it for a life time.

When parties make a *contract*, and come into court and ask to have it put in the *form* of a decree, for their own private ends, that is a " consent" decree, and many times done in fraud of some other person's rights.

But in this case the court had jurisdiction of the cause, and in making the order, adjudged on evidence in the premises ; and such order, unless the court were without jurisdiction, is binding on the parties until set aside.

The condition of the property had become changed, not by administration of it, but by an inherent quality in the property itself ; and it became the duty of the court to compose differences incident to the change, and administer the trust, in the modified form that had come upon it, in the spirit of the original decree. And the decree seems to have been founded on evidence outside the agreement of the parties, and in accord with the act of the legislature, and apparently is a decree of the court, and binding

as other judicial decrees. The claim that other property, alien to the trust, had become incorporated into the decree of 1864, and therefore without supplemental pleading of the parties, the decree was without judicial quality, is not supported, because the construction of the road to its chartered limits introduces no new or alien property into the trust, any more than the construction of a new and costly bridge in the line of the road. · The same property originally committed to the managers remained in the hands of its managers, enhanced in value, and changed somewhat in its incidents; and under the act of the legislature the court had proper jurisdiction to make decree in the premises. If it be conceded that any order of the court is without judicial authority in part, or in the whole, and is *coram non judice* and void, the order is invalid, but the jurisdiction of the court over the subject-matter is in no way affected, nor the judicial possession of the property, and for a stronger reason, mere error in procedure would have no such effect. The " adjustment " recommended by the parties provides that it should be without effect, unless made-sure by legislative act or otherwise, that the possession and control of the property was kept in the continual power of the court. And so the property continued to be administered under the order of the court, but essentially as parties in interest from time to time desired and requested, as for the best interests of the property, under the order of the Court of Chancery, until 1873, when by an adversary proceeding the Central Vermont Railroad Company was made managers.

The claim, that by some mysterious alchemy, the judicial hold upon the property by the court had become loosed, and the property sent adrift, out of court, " unhouselled " and without a reckoning, for some error of procedure or of administration, has no legal foundation.

It would be a caricature upon jurisprudence to hold that property, lawfully in the possession of the court by its receivers, had, without the knowledge of the court or the parties in interest, so drifted out of the jurisdiction of the court, that now *rights* of property in the subject of such receivership can only be settled by *wreckers* in the scramble for *salvage*.

The court having brought the property into court for judicial administration, it holds that control until by some lawful order such possession comes to an end.  It is said, that by the adjustment in the compromise decree, the rents in arrears of the Canada had become paid, so that the necessity or propriety of a court management had ceased.  Suppose this court should think so ; yet that court adjudged otherwise ; and do the orders of that court thereafter, for that reason, become a nullity ?  No warrant of law can be found for such assumption.

But it is not quite exact to say, that in the compromise decree, all arrears of rent had been paid.  There remained unpaid the sum of $97,000, which the managers were " ordered to pay, with interest, within three years, in money."   p. 282.

Although the Canada railroad gave certificates of indebtedness for that sum to the stock owners of the *Canada*, they were mere *evidence* of the debts.  And in the decree of May 1st, 1867, the managers represented that the debt had matured and remained unpaid, with accrued interest, and it was provided for in that decree by the further issue of stock.  In the meantime a large debt of the *managers* had been incurred in the *first equipment loan*, authorized by the court and consented to by the parties.  There was then a continued judicial possession and right of the control of property in the court, from the time it was put into the possession of the court by the decree of 1861, until it was put into the possession of the Central Vermont R. R. Co., by the decree of the court in 1873.   And no error of *procedure*, and no excess of jurisdiction in the orders in administration of the property, even if such orders would have been invalid except for the consent of the parties in interest, can oust or restrict the court in the exercise of its legitimate powers.

The Central Vermont R. R. Company was enabled and authorized by its charter to become receiver and manager of this property under the order of the court in the cause then pending; and the court, with full notice and hearing of the parties in interest, appointed it to that duty.   It is said the court had no such power ; that it could make no such decree except by consent ; and as the Canada dissented, this anomalous thing had at length come to an

39

end, and the court had no power over it except as a mere irresponsible agency of the parties; that by enlarging the scope of the administration, at the instance of the parties, and by including in its decree some matters that were not " cognate," all jurisdiction over the property, and all legal possession and control of it had, unknown to the court or the parties, oozed away.   But as we have shown, the court still had the legal control and custody of the property, and had legal power, for sufficient reasons, to appoint other managers of it, and if there was error in the exercise of its discretion, the appointment was valid until set aside.

It is claimed the court could not appoint managers, on *petition*, in the pending cause, but only on the filing of an original bill. It was decided by this court, in the 50th Vt., that a *petition* to order a *sale* of the property, under the acts of legislature and under the provisions of the original decree, was a legal method of proceeding for such purpose; and it would seem to follow that this proceeding by petition was a legal method of proceeding, if such decree may be otherwise properly made.   It is claimed that managers could not be appointed in *vacation*, but only at a regular term of court; but such a decree is interlocutory; and under our statute the Court of Chancery is always open to make any decree, save only a *final* decree, and such has been the practice in other jurisdictions.   High on R. p. 247–530 ; Gen. Sts. 248, s. 14.   The court, then, had the judicial possession, control and jurisdiction over the property, since the decree of 1861 until the present time.

It is well settled that a Court of Equity may, by a final decree, subject property mortgaged, or the subject of a lien, to sale or foreclosure to respond to an ascertained debt, and retain the bill for the enforcement of further liens which may thereafter be proved and established.   *Ward* v. *Todd*, 103 U. S. 327 ; *Sage* v. *Central R. R. Co.*, 99 U. S. 334 ; Story's Eq. Pl. 104–5.   And the court will often grant such relief, by final decree, to an innocent creditor of the trust, without waiting to settle the accounts of the trustee or manager.   *Railroad Co.* v. *Soutter*, 2 Wall, 510 ; *Cheever & Hart, Trustees* v. *R. & B. R. R.*, Steele, J.

It was mutually arranged in the cause that a committee of the

bondholders should audit the accounts of the managers, and if the Canada objected to the allowance, all questions should be settled in the usual course, by the court. The Canada has heretofore refused to be a party to the accounting, and so the accounts remain unsettled.

But we think that all that have been in the management of this trust should have their accounts settled, and all equitable offsets ascertained, before a final decree should be made, so that when a decree is made it will be " the beginning of the end."

It is apparent that the Central Vermont R. R. Co., and the parties connected with the management of the trust, are the acting parties in prosecuting this cause, and it is their fault, and that of the primary parties, that the accounts have not been settled. The Central Vermont Railroad Company should, therefore, have been retained as party in the cause, and its accounts settled. Its rights and liabilities in regard to the diversion of the income from the car service from the sinking fund, as well as the absorption of the income of the property by methods that are in dispute, will come up for adjudication, on the report of the masters.

The amount and value of the *special securities* to the bondholders cannot be fully determined until the accounts and liabilities of the managers are ascertained. And we think the *equipment* pledged as special security, should not be withdrawn from the working operation of the roads until a final decree, when provision will be made in regard to it. Such severance of the equipment from the roads cannot but work detriment to the property and its income.

And this court holds, as was substantially held in the case before, that the bonds named in the decree below, and all legitimate debts arising from or incurred by the administration of the property in the hands of the managers, are, or may be declared by the court, a charge or lien, in the nature of an equitable mortgage upon the property which is the subject of the trust, and that property embraces the railroads and accretions, equipments and all property that has come into the hands or possession of the managers since the decree of 1861. If the debt is redeemed by the primary parties, they will become the owners of the whole

property; if the property shall not be redeemed, then the amount and value of the special securities, that should in equity be applied in satisfaction of such debts, should be ascertained and applied.

The interest, specified on the face of the bonded debt at eight per cent., is sanctioned by act of the legislature, and in that we find no unlawful usury. The managers paid seven per cent. interest in providing for the floating debt; the report shows that in 1872 that debt amounted to over $2,800,000, and some of the paper had gone to protest, and in the stringent state of the money market it was *necessary* to pay that interest to relieve and protect the trust property. The court had authority, under the statute, to authorize such interest; but no such order has been made. It is well settled, that in such case, a court will sanction what it would have authorized. Perry, p. 824, s. 915. But that point is left undetermined until the managers' accounts are settled.

The floating debt, after all equitable offsets are made, including the Grand Trunk claim, like the bonded debt, constitutes an equitable mortgage upon the trust property; but whether they have precedence, or right superior to the other creditors of the trust, is not now determined. It may be proper, however, to state that it now appears that the floating debt accrued from the daily expenses of operating the roads, a fact that did not appear in the case when the matter was discussed in 1877. As the Central Vermont Railroad Company, when made receiver and manager by order of the court, was directed to pay the indebtedness of the former managers, we think it would succeed to their rights, and have any priority that would have been accorded to the original parties who first incurred the liability. As to the securities purchased by the managers, at the request of the security holders, at ninety per cent. of the face value, the facts stated in the masters' report fully show that the purchase was not made for personal gain, but rather in an emergency, to save the property of the trust from destruction; yet it is a rule of equity law, not founded altogether on abstract justice, but as a rule of *public policy*, that the *fiduciary* shall not be permitted to make profits in the trust, or at the expense of his beneficiary. As against the primary parties, if the

property is redeemed, the managers will be permitted to charge the money only paid for such bonds or securities, with the interest at eight per cent., as provided in said bonds. But if said property is not redeemed, as said bonds were purchased at the request of the security holders, and for their benefit, the managers holding such bonds should share in the assets *pro rata* with the other holders of like securities. As to the bonds for one thousand dollars, expended to keep up a reading room for the benefit of the employes of the railroad, it is a proper charity at the hands of the owners of property, but not a legal accounting for *trust funds* in the hands of a trustee.

To summarize what has been decided: We hold that the possession of the property, put into custody of receivers and managers in 1861, in the cause of the *Vermont and Canada Railroad Company* v. *The Vermont Central Railroad Company*, has been in the court in the hands of managers appointed by and holding for the court, as its officers, continuously from that time to the present; that said cause, during that period, has been and still is pending; that the control and management of said property, in its legal character, has been judicial; that the management for several years having been, by the consent and agreement of the owners of the property, under the sanction of the court, any error of *procedure* does not destroy or impair the jurisdiction of the court or its judicial hold of the property, once legally obtained, or the judicial character of its orders; that the court had the judicial power, on petition in the pending cause, to appoint the Central Vermont Railroad Company receivers and managers of said property:

That the debts legitimately incurred by the managers, which shall remain after applying all equitable offsets, constitute a lien, and a court of equity will make it a charge, in the nature of an equitable mortgage upon the whole property which is the subject of the trust, which may be enforced by strict foreclosure, and that no amendment of the bill is required to admit of this relief; that such mortgage embraces the franchise to run the roads; see *Eldridge* v. *Smith*, 34 Vt. 484; *Bank of Middlebury* v. *Edgerton*, 30 Vt. 182; 2 Redfield on R. 519, note; and that as an incident of the

foreclosure, the court may direct a release by defendants of their interest in said property to a trustee, to hold for the benefit of the trust creditors. Seton's Eq. Forms, p. 211; Decree of Lord ELDON, *Slade* v. *Rigg*, 3 Hare, p. 35: That all sums, that are or should be in the hands of the managers, arising from the trust or growing out of the operating of said property, should first be ascertained and applied in reduction or extinguishment of such trust debt, before any final decree against the property shall be made. In settling the accounts of the managers, the court will be governed by the legal rules applicable to managers in a court of equity of an administrative trust, as modified by the agreements or consent, actual or constructive, of the parties in interest.

Non-concurrence by

TAFT, J. Without entering at length into a discussion of the various legal questions involved in this case, I desire to enter my dissent from the opinion of the court upon one of the most important points.

I cannot concur with my brethren in holding that the indebtedness of the managers of the property in question constitutes a lien, or can be made a charge, upon the Vermont & Canada Railroad. It is said that this question is *res adjudicata*. I do not so regard it, notwithstanding what is said in the opinion in this case reported in 53 Vt. 283. I consider it an open question.

I do not deem it material upon this hearing to pass upon the question of the particular character in which the managers have been acting. They were either strict receivers; or were managing agents in control of the property by the consent of the owners. Acting in either capacity, the ordinary rule applicable in case of receivers would apply. The managers would be entitled, out of " the funds," to their costs, charges, and expenses properly incurred in the discharge of their ordinary duties, and in extraordinary services which have been sanctioned by the court. I am aware that in some instances repayment to the managers of property held by receivers of advances made by them, has been ordered out of the *corpus* of the estate—Kerr on Receivers, 2d Am. Ed. 239 ; and this latter rule I think is properly applied

in this case as against the Vermont Central Railroad and its mortgagees. All that, I think, has as yet been decided by this court, using the words of REDFIELD, J., is " that a court of equity would charge the *property which was the subject of the receiver-ship*, created by the court in 1861 in behalf of the *bona fide* holders of such bonds, (those issued by the managers,) with an equitable lien, and cause it to respond in payment of such debts." It is in determining what the " funds," or the " property which was the subject of the receivership " was, that I think the court have erred.

The receivership was originally ordered by reason of the default of the Vermont Central Railroad Company. That corporation is what I regard as the *primary* party, and it is the property of that corporation that, I insist, is the " subject of the receivership." What was that property ? There is no contention upon that point. It was the road-bed and rolling stock of the Vermont Central Railroad Company, and the rights of the latter company to the possession and use of the Vermont & Canada Railroad under the leases of 1849 and 1850 ; in consideration of which possession and use certain rent was to be paid by the Vermont Central Railroad Company to the Vermont & Canada Railroad Company. The two roads were as distinct after the leases as before; their organizations were separate and there was nothing in common between the two. Each company owned its own road-bed ; and one had by contract a right to use the road-bed of the other, and was under obligation to pay rent for such use. The estate of the Vermont Central Railroad Company in the road-bed of the other company, was that of a lessee, a leasehold estate ; and the receivers took the property with the same rights, and subject to the same obligations, as it had theretofore been held by the lessee. Where a receiver is appointed, of a leasehold estate, the performance of all the obligations imposed by the possession of the land devolves upon him ; and he is bound, in the first place, out of the sub-rents, or receipts, to discharge the head-rent, where the right of the landlord is undisputed, without an order for that purpose. In the case at bar the rent due the lessor was paid and discharged, until the year 1872. Until that time, as its rent had been duly

paid, the Vermont & Canada Railroad Company had no cause for complaint. Since that time it has been earnestly protesting against the possession of the present managers. Upon what principle then of law or equity the property of the Vermont & Canada Railroad Company can, in the way proposed, be taken to pay the expenses of the trust, I am unable to determine ; and for this reason I dissent from the conclusion at which my brethren have arrived. That corporation is of course liable for all obligations which it has *lawfully* assumed ; and the holders of such obligations have in respect thereto a full and adequate remedy at law ; but they have no right to a foreclosure of the property of the company in question, as they have no lien upon it, possessing only the rights of an ordinary creditor.

It may be said that as the receivership was originally created upon the petition and at the request of the Vermont & Canada Railroad Company, if the property which was the subject of the trust, and which I have above referred to as the Vermont Central Railroad, its equipment, and its leasehold estate in the Vermont & Canada Railroad, is not sufficient to pay the expenses and debts of the management that the company is liable to make good any deficiency. Admitting such liability on the part of the Vermont & Canada Company, upon what principle can it be claimed that the proper way of enforcing it, is by a general foreclosure of the property of the trust and that of the *cestui que trust* combined ? I am aware of no law or practice authorizing it in this State ; and in my opinion there should be none.

While I do not object to the disposition of the case as to the special pledges of the equipment, I think it would have been the better way to have ordered a foreclosure as to them; and, if unredeemed, have applied the value of the property upon the claims for which it was specifically pledged, and if insufficient to pay the amount secured, have admitted the holders of that debt as general creditors of the trust, for the amount unpaid ; but the course ordered violates no legal or equitable principle.