## THE BOSTON & NEW YORK AIR LINE RAILROAD COMPANY *vs.* OWEN V. COFFIN AND OTHERS.

The N. H., M. & W. Railroad Company, organized under a charter which authorized it to take or purchase and hold such real estate as might be necessary or convenient for the construction and operation of the road, made in 1869, under authority of an act of the legislature, a mortgage to the treasurer of the state to secure an issue of bonds to the amount of $3,000,000, which was recorded, as required by the act, in the office of the secretary of the state; the property mortgaged being described as " all the railroad of said company as the same is now or may be hereafter located or constructed, and all the lands that are or may be included

in the location of the road or required by said company for the purposes of the railroad, with all property, real or personal, which now belongs or may hereafter belong to said company and be used as a part of the railroad or be appurtenant thereto or necessary for its construction or operation, and all the property, rights and franchises of said company under its charter." After the execution of the mortgage the president of the company purchased with the funds of the company sundry pieces of land for the track of the road, in several instances buying more than was needed with the intention of disposing of the surplus for the benefit of the company and thus obtaining the necessary lands at less cost, all the deeds being taken in such cases in his private name and that of *O*, the treasurer of the company, as joint tenants, for convenience in making conveyances. In 1870 the president and treasurer, with the approval of the company, mortgaged a portion of these lands, lying outside of the lay-out of the road, to *C*, to secure him for advances made for the road. *C* soon after made further advances upon the promise of the president that all the lands of the company except those used for the purposes of the road should be conveyed to him free from incumbrance as security. In 1872, the president of the road having died, *O*, the treasurer, under a vote of the directors, conveyed to *C* sundry other lands of the same character, which had been taken by the president and himself, intending to convey all that were so held for the company except such parts as fell within the lay-out of the road; but by mistake the draftsman omitted four parcels. In 1875, under statute regulations, the treasurer of the state foreclosed the mortgage of 1869 and conveyed the property of the railroad company to the plaintiffs, a newly organized corporation. In the foreclosure proceedings *C* was not made a party. In a suit brought against *C*, and certain parties who held under him, and against *O*, to compel *O* to convey to the plaintiffs the lands still standing in his name, and for a foreclosure of the other defendants, it was held—

1. That lands purchased by the railroad company outside of the lay-out of the road, and not needed for the construction or use of the road, were not covered by the mortgage.

2. That lands purchased after the mortgage was made, that were needed for and used by the road, passed by the mortgage, although the legal title was in the president and treasurer in their private names, they having been procured with the funds of the company and being held in trust for it, and that the mortgage of them was good against *C* and his grantees; the entire lay-out of the road being recorded under the charter in the office of the secretary of the state. (One judge dissenting.)

3. That the lands omitted by mistake in the deed of *O* to *C*, so far as they lay outside of the lay-out of the road and were not needed for its use, could be decreed to be conveyed by *O* to *C*.

4. That the plaintiff could not maintain a suit for a foreclosure against *C* and his grantees, so far as their interests were subject to the mortgage made by the railroad company, but that the suit could be brought only by the treasurer of the state.

5. That evidence was admissible of the representations and promises of the president of the company to *C*, under which the latter had made

advances to the company relying on a conveyance of the lands as security.

SUIT for the conveyance of certain lands and for the foreclosure of a mortgage; brought to the Superior Court in Middlesex County. The defendants were O. V. Coffin, Allyn M. Colegrove, Lucia C. Birdsey, Sarah H. Colegrove and Allyn M. Colegrove, administrator of the estate of Elihu H. Birdsey. Facts found and case reserved for advice. The case is sufficiently stated in the opinion.

*S. E. Baldwin*, for the plaintiffs.

*R. G. Pike*, for the defendant A. M. Colegrove.

*D. Chadwick* and *S. A. Robinson*, for the defendants L. C. Birdsey, S. H. Colegrove, and A. M. Colegrove, administrator.

PARK, C. J. The principal question in this case is, whether the mortgage of the New Haven, Middletown & Willimantic Railroad Company to the treasurer of the state, made on the 31st of May, 1869, to secure the bonds of the company to the amount of $3,000,000, included such portion of the lands in question as were not necessary or convenient for railroad purposes.

The property mortgaged is thus described in the mortgage deed:—" All and singular the railroad of the said party of the first part, from the city of New Haven to the village of Willimantic, in the state of Connecticut, as the same is now or may be hereafter located, constructed or improved; and all the roadway and lands that are or may be included in the location of said railroad or acquired by said company for the purpose of said railroad, within the several points aforesaid; with all and singular the railways, rails, bridges, fences, station-houses, depots, shops, buildings, structures, tools, cars, engines, equipments, machinery, fuel, materials, privileges, appendages, appurtenances and property, real and personal, which now belong, or may hereafter

belong, to the said company, and be used as a part of the said railroad, or be appurtenant thereto, or necessary for the construction, operation or security thereof; and also all the property, rights and franchises of the said company under its charter and every part thereof; together with the tolls, income, issues, and profits thereof, and all rights to receive the same, and everything necessary for the completion and operation of the road."

It will be observed that the description of the lands mortgaged is in almost every instance qualified by some one of the following phrases—"that may be included in the location of said railroad"—"used as a part of said railroad"—"appurtenant thereto"—"necessary for the construction, operation or security thereof"—"necessary for the completion and operation of the road." If the mortgage was intended to include all the lands of the railroad company, whether they were necessary for railroad purposes or not, it is strange that these qualifications should have been made. But the plaintiffs make the claim that the phrases, "lands acquired by the said company for the purposes of said railroad," and "all the property of the said company under its charter and every part thereof," were intended to be without qualification, and to include all the lands owned by the railroad company. But we think the context, at the places where the phrases relied upon are found, clearly shows that they are subject to the same qualification that is applied to other property mentioned, and that they were intended to be confined in their application to what was prospectively necessary and convenient for the construction and future operation of the railroad. The construction and operation of the road were the objects to be accomplished, and lands "acquired for the purposes of the road," were lands acquired for the accomplishment of these objects, and must be lands necessary and convenient for such construction and operation. Lands purchased and sold at a profit, although the profit might be expended in the construction of the road, were never intended to be embraced by the phrase, "acquired by the company for the purposes of the railroad."

The other phrase, "all the property of the said company under its charter," is found intimately connected with the phrase "and everything necessary for the completion and operation of the road." These expressions are brought together in the same sentence, and it would be strange if the former should be more comprehensive than the latter, when the latter is a sweeping clause, evidently used by the draftsman to include everything intended to be conveyed which possibly the previous language might not include.

Again, the case finds that the railroad company in procuring their right of way considered it advisable, as a matter of economy, to purchase in many instances larger tracts of land than were required by necessity or convenience for such way, and to sell the surplus. It was thought that the cost of their right of way through such lands would be lessened by it. Nearly all the lands in question are included in the surplus of such purchases. The case further finds that the bonds, which the mortgage was given to secure, would have twenty years to run. It would seem therefore unreasonable to suppose that lands, purchased for a temporary purpose, would be included in a mortgage that was to run so long.

Again, the company had no power under their charter to purchase and permanently hold lands not required by necessity or convenient for the purposes of the railroad. The language of the charter upon this point is as follows:— "And said corporation is hereby vested with all powers, privileges and immunities, which are or may be necessary to carry into effect the purposes and objects of this act as herein set forth. * * And shall have power to purchase, receive and hold such real estate, in fee simple or otherwise, as may be necessary or convenient, to accomplish the purposes of this act." The object and purposes of the act are thus stated:—"To locate, construct, maintain, complete and operate a single, double or treble railway or railroad, from some suitable point in the city of New Haven, * * to some suitable point in the village of Willimantic." Such lands, therefore, as were "necessary or convenient" for the

location of the railroad and all its appurtenances they had the right by their charter to purchase or take in order to locate, construct, maintain, complete and operate a railroad between the points designated. It will be observed that the right of the company to purchase is limited to such lands as they have the right to take for railroad purposes; and certainly they had no right to take surplus lands in order to make their right of way through such lands cost less than it could have been otherwise obtained for. But the claim of the complainants would leave the power of the company to purchase lands unlimited, for if the terms of the charter could be made to embrace lands not " necessary or convenient " for the purposes of the railroad, there would be no limit to the power of the company to make such purchases. We do not mean to say that the company could not purchase land of which a portion was not needed and hold the surplus temporarily, where by so doing they could acquire the right of way through the land more cheaply, intending at the same time to sell or otherwise obtain the value of the surplus lands within a reasonable time, and expend the proceeds in the construction of the road. What we mean to say is that the company had no right under their charter to purchase lands that were not needed, and permanently hold them, as the claim of the plaintiffs under this mortgage would seem to imply. Such being the case, it is reasonable to suppose that the parties to the mortgage in question intended only to give on the one hand and receive on the other what the company could lawfully hold under its charter, and inasmuch as the language of the mortgage can be construed in accordance with such intent, we think it should have such a construction. The words " necessary or convenient," as used in the charter and mortgage, should have a liberal construction, and should include all that has been found to be reasonably necessary or convenient for the successful operation of the road since its construction. But inasmuch as some parts of the lands in question have been found to be unnecessary and not required by convenience for such purposes, we think those parts are not included in the mortgage.

The following cases bear upon the question we have been considering. *Raymond* v. *Clark*, 46 Conn., 129; *Walsh* v. *Barton*, 24 Ohio St., 28; *Eldridge* v. *Smith*, 34 Verm., 484; *Shamokin Valley R. R. Co.* v. *Livermore*, 47 Penn. St., 465; *Dinsmore* v. *Racine & Miss. R. R. Co.*, 12 Wis., 649; *Youngman* v. *Elmira & Williamsport R. R. Co.*, 65 Penn. St., 278; 1 Jones on Mortgages, sec. 156.

It appears by the finding that "the plaintiffs and their grantors have used for railroad purposes portions of the lands in controversy that are outside of the location of the railroad, and the plaintiffs have been in the possession of such portions for such uses. Their freight depot is partly on such lands." We understand this to mean that such lands were necessary or convenient for railroad purposes; and if so they were covered by the railroad mortgage.

It further appears in the case that the mortgage and deeds from Coffin to Colegrove included all the lands described therein, "except such portions thereof as were within the lay-out or location of the railroad." It follows that the railroad mortgage included some lands that the Colegrove mortgage and deeds likewise included; and so far the Colegrove mortgage and deeds became a subsequent incumbrance upon the property.

It may be said that the railroad company never had the legal title to the lands thus covered by these deeds, and that therefore the railroad mortgage is ineffectual as against the defendants. These lands were as necessary for the successful operation of the railroad as the land covered by the lay-out. It is manifest that the road could not be operated without depots and side-tracks. They are as essential as the road-bed itself. Now it is conceded that the railroad mortgage is effectual to secure the bondholders so far as the lay-out of the railroad over the lands in controversy is concerned, and if so, what good reason can be given why it is not equally effectual so far as the land covered by the railroad depot is concerned? The title to both was taken in the name of Lyman, the president, and Coffin, the treasurer, for purposes of convenience in the sale of lands of which

they formed a part. The railroad company were the equitable owners, and agreeably to their charter, mortgaged the land covered by the lay-out of the road, and other lands necessary and convenient for the construction and operation of the road. And agreeably to their charter the deed was recorded in the office of the secretary of the state, in order to give constructive notice to the defendants, and all others interested, that the land now under consideration was included in the mortgage deed. The case was exceptional. The recording of the deed in the office of the secretary had the same effect that it would have had if the deed had been recorded in the records of all the towns along the line of the road. Colegrove knew that the lands were purchased by the company for railroad purposes so far as they were essential. He knew, or ought to have known, the charter of the company and what powers it conferred. He had constructive notice of the deed, and was in fault that he had not actual knowledge. He had all the means of knowledge that the nature of the case could furnish, or that the charter deemed important. The railroad company were the real owners of these lands, and no one would question their ability to mortgage them, although they never had the legal title. The law would compel a transfer of such title, at any time, to the grantee.

But, it is said, that the railroad company, by a vote of its directors, authorized the deeds to Colegrove. How does that affect the question? Can a grantor, after he has conveyed property, convey it again so as to affect the former grantee? Certainly not. We see no reason why the railroad mortgage is not effectual against the defendants so far as it covers these lands.

It appears that the defendants, to whom the property was conveyed by Colegrove, were not made parties to the foreclosure of the railroad mortgage, and consequently they were not affected by it; and hence arises the question, whether the prayer of the complaint can be granted, which asks for a foreclosure of whatever interest the defendants may be found to have in these lands. The charter of the

New Haven, Middletown & Willimantic Railroad Company specially authorized the company to issue its bonds to a certain amount, and prescribed the manner in which they should be executed and recorded, and the time when they should be issued. It further authorized the company in a certain specified mode to secure its bonds " by a mortgage of its railroad, and all its property, rights and franchises under its charter, or any part thereof, by deed duly executed by its president under the corporate seal of the company, to the treasurer of the state and his successors in office, in trust for the holders of the bonds; which deed shall be recorded in the office of the secretary of this state."

The General Statutes on the subject prescribed the duties of the treasurer in the premises, and under what circumstances foreclosure proceedings should be brought. The charter of the plaintiffs' company directed the treasurer to convey to the plaintiffs in fee simple all his right, title and interest in the mortgage property, after the same should have become foreclosed, in the following language:— " Whenever the title of the trustee under the first mortgage shall become absolute by the foreclosure of the mortgage premises, he shall  *   *   convey to said company [the plaintiffs] and its successors and assigns, in fee simple, all his then right, title and interest in and to said mortgage premises."

Thus it appears that every step in the proceedings from the giving of the mortgage down to the conveyance of the property to the plaintiffs was prescribed by the legislature. The subject was of course one to be regulated by legislation; and the legislature having prescribed a certain course to be pursued, impliedly denied the right to pursue any other. The treasurer pursued that course, and foreclosed nearly all the property conveyed to him by the mortgage; but by oversight failed to accomplish the object so far as the small portion was concerned on which these defendants hold a second mortgage, by omitting to make them parties to the proceeding; and the question is, can the plaintiffs do what the treasurer failed to do? or does that duty still

remain with the treasurer? If the plaintiffs can sustain a suit of foreclosure for a part of the property mortgaged to the treasurer, they could have done so for the whole, and the action of the treasurer in the matter was wholly unnecessary. The treasurer was made the trustee of the property for the bondholders; and that trusteeship could not be otherwise discharged than by pursuing the course prescribed by the legislature. That course was the only one provided for a transfer of the property from the one company to the other, to wit—a foreclosure of the property by the treasurer, and a conveyance of it by him in fee simple to the plaintiffs, after the title had become absolute in him. We think the treasurer is still the only one who can sustain a suit for a foreclosure. He has performed a part of his duty; let his successor perform the remainder, if it is to be performed at all. A majority of the court are of the opinion that the prayer of the complaint in this regard cannot be granted.

Can the prayer be granted which asks a decree for the conveyance to the plaintiffs of the title to the lands remaining in the name of Coffin, the secretary of the New Haven, Middletown & Willimantic Railroad Company?

The facts in this part of the case are substantially as follows. The titles to the lands in controversy were taken in the name of the president and secretary of the last named company in order that they might more easily be disposed of and the proceeds expended in the construction of the railroad, the title being taken by them as joint tenants. The defendant Colegrove loaned the company large sums of money to be so expended, and a mortgage of that portion of these lands lying without the location of the railroad was made to him to secure the loans. Colegrove for a valuable consideration assigned the mortgage note to the defendant Birdsey, who received the same in good faith, and had no knowledge that the railroad company or the treasurer claimed any interest in the lands described in the mortgage deed. Afterwards Colegrove loaned other large sums to the company to be expended in the construc-

tion of the road, on a representation made by the president of the company that the title to these lands was taken in his name and that of Coffin, the secretary, in order that they might dispose of such portions of them as lay without the location of the railroad, and use the avails for railroad purposes; that the lands were free from all incumbrance, and that they should be conveyed to him as security for the advances he had made or should thereafter make to the company, with the right on his part to sell the lands and from the avails pay the amount of his claims. Induced by these representations Colegrove afterwards made the advancements stated, and deeds were given of the lands, with the exception of what was contained in the lay-out of the railroad, to secure them. Colegrove took the deeds in good faith, without any knowledge that the railroad company or the treasurer of the state claimed any interest in the lands. He afterwards, for a valuable consideration, conveyed all his right, title and interest in the lands to the defendant Birdsey, who likewise received the same in good faith without any knowledge that the railroad company or the treasurer claimed any interest in them. The grantor of the deeds intended to convey and supposed that he was conveying to Colegrove all the lands in controversy outside of the location of the railroad, but by the mistake of the draftsman of the deeds four pieces of land, designated as Nos. 1, 2, 3 and 4, were omitted. Coffin, the grantor, had title not only to the lands conveyed and to the four pieces omitted, but also to that portion adjoining them which is covered by the lay-out or location of the railroad. The lands covered by the lay-out are not in controversy in this suit for the defendants have no interest in them. It does not appear where the four pieces of land omitted are located. If any part of them are within the location of the railroad, then we are all of the opinion that Coffin should convey such portion to the plaintiffs, together with all other lands standing in his name which are covered by the location or lay-out of the railroad. And we are all further of the opinion that the portion which lies without the railroad

mortgage should be conveyed in fee simple by Coffin to the defendant Colegrove, in trust for the defendants Lucy C. Birdsey and Sarah H. Colegrove. And it is the opinion of us all that all the lands in controversy outside of the mortgage, are the absolute property of the defendants.

If any part of the four omitted pieces are covered by the mortgage and lie without the location or lay-out of the railroad, then a majority of the court are of opinion that Coffin should convey such portion to the defendant Colegrove, in trust for the defendants Lucy C. Birdsey and Sarah H. Colegrove, according to the agreement under which Colegrove made his advancements to the railroad company.

The plaintiffs claim that the defendants have not laid the foundation for affirmative relief by filing a sufficient cross-complaint to that effect. But the defendants have filed what has all the essential elements of a cross-complaint. It states all the facts, and asks a conveyance of the lands remaining in the name of Coffin. We think it is sufficient.

In regard to the testimony which was objected to on the trial before the committee and the court below, we all think it was properly received for the purposes claimed. The defendants' answer and cross-complaint allege the facts, which the evidence tended to prove. It is there set forth that the defendant Colegrove loaned large sums of money to the railroad company in consequence of the promises of the president of the company that he should have security for the loans in deeds of the lands, to which the president then held the legal title as a joint tenant with Coffin, the secretary of the company. And it is further set forth, that after the death of the president Coffin attempted to consummate the agreement by a conveyance of the lands, and supposed he had done so, but by mistake failed to accomplish the object. We think these allegations admitted of being proved. It appears that the legal title to these lands was taken in the names of the president and secretary that they might more easily be disposed of and the proceeds expended in the construction of the railroad. They were

so disposed of, and the proceeds were so expended, and the company had the benefit of them.   We think the evidence was properly admitted.

We therefore advise the Superior Court, on a further hearing of the case as to what lands were mortgaged to secure the bondholders, and as to the location of the four pieces of land omitted by mistake from the mortgage to Colegrove, to render judgment in accordance with the foregoing opinion.

In this opinion PARDEE and LOOMIS, Js., concurred.

CARPENTER, J., (dissenting.)   I cannot assent to one position taken by the court in this case, and that is that the first mortgage of the railroad company embraced and conveyed a title to land, the title to which the railroad company never acquired, and never had any right or interest in, except such right or interest as may have arisen from the fact that the company possessed and used the land for railroad purposes, in connection with the further fact that it was purchased with funds of the company.

In the descriptive part of the deed we find this language: —"And all the roadway and lands that are, or may be, included in the location of said railroad, or acquired by the said company for the purposes of said railroad,   *   *   and property, real and personal, which now belong, or may at any time hereafter belong to said company, and be used as a part of said railroad, or be appurtenant thereto, or necessary for the construction, operation or security thereof."

The language—"acquired by the said company," or "belong to"—manifestly mean something more than the mere naked possession of the land.   This is not apt and appropriate language to describe mere occupancy.   As ordinarily used it clearly imports a title of some kind.   If it does not mean that here it might have been entirely omitted, as the following clause clearly denotes a possession.

It is a startling proposition that a railroad company may insert in its mortgage such language, and that it carries to

the bondholders any land which the company may at any time thereafter use rightfully or wrongfully for railroad purposes.

The charter authorized the company to secure its " bonds by a mortgage of its railroad and all its property." Vol. 6, Special Laws, p. 288. The language of the general statutes is the same. Rev. Statutes, 1866, p. 195, sec. 511. Thus the power conferred was limited in terms to its own property. If therefore the company had in so many words mortgaged all the real estate which it might at any time possess, leaving out the other qualifying words relating to title, such a provision would have been inoperative for want of power. Construing the language of the deed as applying only to property the title to which was at some time in the company, brings the deed within the power conferred. Construing it otherwise leaves the deed without authority; and giving effect to it as thus construed, establishes a principle directly in conflict with our recording system. It is the policy of that system that the title to all land, so far as possible, may be traced by the record. The record should show just what land the company owned and just what they mortgaged.

This mortgage was executed in May, 1869. At that time none of the land in controversy had been acquired; and when it was acquired the deeds were taken to Lyman and Coffin; so that the record shows no title in the company. The only way to show such a title and that the mortgage affected the land, is to show by parol possession and that the land was purchased with the funds of the company.

More than this, the mortgage deed shows no description whatever of the disputed premises. A description of the property conveyed is an essential requisite of a deed. 1 Swift's Digest, 122. An authority however is hardly needed, because a deed without some description of the land would give no information, and a record of such a deed would be worthless.

Land which the company subsequently acquired appeared on the record, and, being aptly described or referred to as

included in the premises conveyed by the deed, by force of
the covenants therein contained, operating by way of an
estoppel, vests at once in the trustee. But here there is no
title in the company for the covenants in the mortgage deed
to operate on.

Again. To give this deed such a construction and such
an effect violates not only natural right but the constitution
itself. If the land of Mr. Colegrove, or those represented
by him, may be taken in this way, the land of any other
man and of every other man on the line of the railway may
be taken in the same way—may be taken by a mere trespass
without compensation and without due process of law,
which the constitution expressly prohibits.

Now I am fully aware that the majority of the court do
not intend to establish a principle which will lead to such
mischievous consequences. If the proposition should be
submitted to them—Can a railroad company by the mere
occupancy of land for railroad purposes take it from the
proprietor and vest it in its mortgagees? they would un-
hesitatingly answer in the negative. But the serious ques-
tion is, whether that is not the principle which lies at the
foundation of the decision of this point.

The argument is that the company, having through its
officers purchased all this land for railroad purposes, and
having paid for it with its own funds, has an equitable title
to the whole of it, and may use all or any part of it for
railroad purposes, and that the part so used necessarily
passed by the deed to the trustee and by the foreclosure and
conveyance is now vested in the plaintiffs.

Allowing this argument all the force that can possibly be
claimed for it, it meets only a part of the objections to which
I have adverted. But I submit with deference that the
argument is not sound and will not bear close inspection in
respect to any one of them. A careful examination of the
case will show this to be so.

The argument assumes that the company may take posses-
sion of the land at any time and that the effect claimed for
it will follow regardless of intervening rights and equities

acquired by others; an assumption that is wholly inadmissible. When the land was first acquired the company had an undoubted right to take for railroad purposes all that was required; but it could not take a part of it, cause the balance to be sold, and afterwards, in the exercise of the same right, take a part of that which was sold. Having made its election once, it may not make it again to the prejudice of third persons.

Colegrove advanced money to the company upon the credit of this land. On the 15th day of October, 1870, the company was owing him for money so advanced the sum of $14,500. At the same time it was owing Julius Hotchkiss $3,500. Lyman and Coffin on that day mortgaged the premises to Colegrove and Hotchkiss to secure those debts. On the 11th day of August, 1871, the directors approved of that mortgage. That mortgage covered all the land in the pieces described outside of the lay-out. On the 29th day of October, 1872, Coffin (Lyman then being dead,) conveyed the equity of redemption to Colegrove, describing all the land outside of the location of the railroad. That conveyance was authorized by a vote of the directors August 11th, 1871.

Thus the entire title, legal and equitable, passed from Coffin and the railroad company and vested in Colegrove, subject to such interest as Hotchkiss had. As Colegrove had then advanced, or did soon after advance, money enough to more than cover the full value of the land, which money the company had and used in the construction of its road, it is impossible for me to discover any flaw in his title or any want of equity.

In July, 1879, he conveyed the premises to Lucia C. Birdsey. How and when was he or his grantee deprived of that title? It is not pretended that the money has ever been refunded; nor is it claimed that the company, the bondholders, or the present plaintiffs, ever acquired any right from Colegrove or Miss Birdsey. The only ground on which it is claimed that any title passed by the mortgage is an equity in the railroad company, which equity, it is

claimed, is prior in time and in right to the equity of Colegrove.

I have already referred to this position, and said enough perhaps to show that it is not tenable; but as it lies at the foundation of the decision, I propose to examine it a little more in detail. When did the use which was necessary to give effect to the equity begin? And when did the railroad mortgage first take effect upon the land? Certainly not when the mortgage was executed in May, 1869, for the land was not then purchased for the company. Presumptively that use had not commenced October 29th, 1872; for up to that time they were dealing with Colegrove as a purchaser upon the theory that the company had no further use for it. As the record is silent on the subject we have a right to presume that the company acted in good faith with Colegrove and that the use did not commence until after October, 1872. The case then presents this state of things, and brings us to this strange result: In May, 1869, all the railroad property was mortgaged; afterwards the company acquired an interest of some kind in certain land outside of its lay-out; the company sold that interest for its full value, caused the land unincumbered to be conveyed to Colegrove, and used the avails in the construction of the road. The company then entered upon the same land and used it for railroad purposes, and now we are told that that use, because of an equity which once existed but which exists no longer, deprives the grantee of his title and transfers it to the mortgagees. I cannot assent to such a doctrine. I wish to be understood as protesting against it with all the vigor I can command. It will not do to say that the use commenced while the company had an interest in the land, for the record does not show it and we cannot presume it. The presumption is against it. The position of the majority is that it is not material when it commenced. The decision can be vindicated only by taking the broad ground that the effect is the same whenever it commenced. Otherwise they would have directed a finding upon that point.

But I go further. The company never had any interest,

legal or equitable, in the land, *as such*, in dispute. I am not now speaking of the land included in the lay-out, for we all agree that the plaintiffs are now entitled to that; but by the disputed premises I mean the land outside of the lay-out. The company was not authorized by its charter to acquire the land. Hence the deeds were taken to individuals. It is doubtful whether it had the power to acquire any interest in the land as land. However that may be, it manifestly acquired no such interest. The right was a personal right against Lyman and Coffin—a right to have the lands sold and the avails paid over to the company to be used in the construction of the road. It had the same interest in the land *as such* as a creditor of an insolvent or bankrupt estate has in land belonging to the estate—a right to have it sold and an interest in the avails—a right which from its nature cannot inhere in the land.

Upon every ground therefore I am satisfied that there is no equity which ought to prevail against the legal record title. More than this, the equitable title in its broadest sense is in Colegrove and his grantees.