Eldridge *v.* Smith et als.

## JOHN S. ELDRIDGE V. JOHN SMITH AND OTHERS.

### [IN CHANCERY.]

*Jurisdiction of Courts of Equity. Trustee. Railroads. Eminent Domain. Franchise. Mortgage.*

When one owns and is in possession of land, over his title to which there is a cloud by reason of a claim of title on the part of others, a court of equity has jurisdiction, upon a bill for that purpose, to remove such claim, and to relieve the orator's title from the cloud.

One to whom certain property has been conveyed by his debtor, in trust for other parties, is not, by the obligation of his trust, precluded from purchasing or levying upon other property of the debtor for his own personal benefit.

The mortgage by a Railroad Company of its road and appurtenances, and its franchise, as a security for debt, does not convey its corporate existence or its general corporate powers, but only the franchise necessary to make the conveyance productive and beneficial to the grantees, to maintain and manage the railroad, and receive the tolls and profits thereof for their own benefit.

The Vermont Central Railroad Company, for the purpose of securing the payment of its bonds, conveyed in trust and mortgage to certain persons their "railroad and franchise, and, also, all the station houses, engine houses, etc., and other appendages, *with all the lands thereto belonging and intended for the use and accommodation of said road:*"

*Held,* That only such land of the Company passed by this conveyance, as was so connected with, and used by the company for, the railroad, that they would have been authorized to take it compulsorily under the provisions of their charter; and that, if it was so connected and used, it was immaterial whether it actually was taken by proceedings *in invitum*, or purchased by the company.

*Held,* also, That the words in the conveyance, "*intended for the use and accommodation of said road,*" applied to the intention of the company in respect to the use of the land at the time the mortgage was executed, and not to the original design of the company when they purchased it.

*Held,* That such mortgage conveyed the full and entire surveyed line of the railroad to its whole extent.

The manufacture of railroad cars is not so legitimately and necessarily connected with the management of a railroad, that the railroad company would be authorized by its charter to take lands compulsorily for the purpose of erecting such a manufactory thereon.

So, also, in respect to the erection of dwelling houses, to rent to the employees of the company.

Eldridge *v.* Smith et als.

Otherwise, as to land taken for piling the wood and lumber used on the road, and brought to it to be transported thereon.

When land is taken for a legitimate railroad use within the scope of its charter by a railroad company, the judgment of the locating officers of the company is conclusive as to the quantity required for that purpose, unless the quantity taken is clearly beyond any just necessity.

The bill set forth, that at the December Term, 1855, of the Windsor County Court, the orator recovered a judgment against the Vermont Central Railroad Company for $59,085.70, damages and cost; that he took out an execution thereon, and on the 14th of May, 1856, caused the same to be duly levied on certain lands belonging to that corporation, situated in Burlington, Northfield, Bolton, Waterbury, Essex, Middlesex, Windsor, and Richmond, which were severally described in the bill; that the Railroad Company did not redeem the lands so levied upon within six months from the date of the levy, and that the title thereto became absolute in the orator; that on the 20th of October, 1851, the Vermont Central Railroad Company conveyed its railroad franchise and certain other property to certain persons and their successors, in trust and mortgage, to secure the payment of the first mortgage bonds of that company, using, in the description of the property therein conveyed, the following words : "The railroad and franchise, called the Vermont Central Railroad, as the same is located, constructed, and improved by said company, extending from Windsor, in the county of Windsor, to Burlington, in said State, and also all the station houses, engine houses, shops, woodhouses, iron, sleepers, and other appendages, with all the land thereto belonging and intended for the use and accommodation of said road, as they now are, and as they may be, if repaired and improved, together with all the locomotive engines, passenger, freight, dirt, hand, and other cars, and all the other personal property belonging to said company, as the same is now in use by said company, or as the same may be hereafter changed or renewed by said company;" that the said Railroad Company, on the 20th of May, 1852, conveyed the real estate and property last above described, and by the same general words of description, to certain other persons and their successors, in trust and mortgage, to secure the payment of the second mortgage bonds of

that corporation; that the lands levied on by the orator were not, at the time of the execution of said mortgages, used by said railroad company for the accommodation of the business of said road, that they had not been since used and were not purchased for that purpose, and that they are not embraced in said mortgages, but that the trustees under said mortgages claim otherwise, and claim that the orator should pay rent to them therefor, and that thereby, and by reason of the loose language of said mort gages, a dark cloud was produced upon the orator's title to such land, which greatly embarassed him in the possession, enjoyment, and sale of the same.     The bill prayed that the orator might hold and enjoy the premises so levied upon, free and clear of any claim of the trustees under said mortgages in law or equity, and that said trustees might be decreed to release and quit claim all right and title to said lands, and that they should be perpetually enjoined from setting up any claim thereto, and for further relief, etc.   The trustees under the first mortgage, described in the bill, and certain bondholders who were made parties to the bill by order of the Court, made answers, the purport of which is sufficiently stated in the opinion of the Court.

These answers were traversed and the cause was referred to a special master, to ascertain and report what parts of the lands in question were occupied by the Vermont Central Railroad Company, and for what purpose, at the date of the said mortgages, and at the time of the orator's levy, respectively, and whether the parts so occupied were necessary for the use and accommodation of said railroad; and if so, what portions, and at what times, and for what particular purposes.

The master reported that he personally inspected the various pieces of land in question, and heard testimony from the parties in reference to the matters referred to him, and he made report of his finding in relation to the several pieces of lands, which it does not become material to recite, the facts in reference thereto being sufficiently stated in the opinion of the Court.

In the Court below, PECK, Chancellor, *pro forma* dismissed the bill with costs, from which decree the orator appealed.

*Andrew Tracy and Jeremiah French*, for the orator.

*Levi Underwood*, for the trustees under the first mortgage.

*Timothy P. Redfield*, for certain bond-holders.

POLAND, Ch. J.    The object of the orator's bill is to ascertain whether the defendants, who are trustees under the two mortgages executed by the Vermont Central Railroad Company, have any valid claim to the lands, or any of them, upon which he has levied his execution; and if they have not, that their claim of title under said mortgages may be removed, as a cloud upon his title, operating to his prejudice and injury.

The orator, being in possession of the lands thus levied upon, cannot himself institute any action at law to settle the title, and the defendants, though setting up a claim to the lands, have brought no suit against him, and have shown no intention to do so.

The bond-holders, who have been made defendants, and have filed an answer, set up therein, that the orator's bill shows no proper ground for the interference and jurisdiction of the court of chancery, for the reason that the orator has an adequate remedy in a court of law; but this objection has not been urged in the argument before us, and, in our opinion, cannot be successfully maintained.    The jurisdiction of a court of equity in such case has been fully recognized in this State in accordance with the authorities on the subject cited by the orator's counsel.— *Hodges v. Griggs & Thrall*, 21 Vt.  280.

The answer of the bond-holders also alleges that the orator's judgment against the Vermont Central Company was obtained by fraud, and without any just debt to sustain it, and professes to give a circumstantial history of the fraud.    If the orator's execution was not levied upon any property, which the bond-holders are entitled to hold under the mortgage to their trustees, it is not apparent to us how they can be permitted to question the validity of the judgment.

If the orator's levy covers any lands which are really included in the mortgage, it is subsequent thereto, and it is not claimed they can be held under the levy against the mortgage title.

It would seem, therefore, that this is a question wholly immaterial to the determination of the rights of these parties ; but if

it were otherwise, this part of the case is easily disposed of, upon the ground that the case does not furnish the slightest evidence to establish what is alleged against the validity of the orator's judgment. The answer, in this respect, is not responsive to the bill, but sets up an independent substantive matter, the proof of which is cast upon the bond-holders.

The answer of the bond-holders, in a vague, uncertain manner, seems intended to raise a question, which has been made in argument by their counsel, that the orator's levy is invalid, because, at the time his levy was made, he was one of the trustees under the mortgage, and bound to guard and protect the trust property for the bond-holders. The general principles advanced by the bond-holder's counsel, in respect to the duties of trustees, as to trust property, that they cannot become purchasers of it, or take it in execution upon their own debts, and that they should maintain the title against adverse claimants, etc., are all unquestionable. But this seems a mere " begging the question." If the orator had a debt against the Railroad Company, and the Company owned property which was not included in the trust mortgage, it is impossible for us to see why he had not the same right to appropriate it, in payment of his debt, as any other creditor. It would be singular, if, in such case, he must stand by and see the property retained by the Company, or taken by some other creditor, because he was a trustee of other property.

The propriety of his conduct, as well as the validity of his levy, stand on the same question : " Were these lands included in the trust mortgage ?"

The question, made in argument by the counsel for the bond-holders, that these lands are covered by the prior mortgage to the Vermont & Canada Co., and that, being released by that Company to the orator, the defendants are entitled to be substituted in their place, and to set up their rights, is not made by the pleadings, nor supported by any proof.

This brings us to the main point in the case, and the only one made by the answer of the trustees under the mortgage, whether the lands levied on by the orator are covered by the mortgage from the Vermont Central Railroad Company to the trustees, executed on the 20th day of October, 1851.

Eldridge *v.* Smith et als.

The property conveyed is thus described in the mortgage :—
" The railroad and franchise of said party of the first part,
called the Vermont Central Railroad, as the same is located, con-
structed, and improved ; and as the same may be hereafter legally
located, constructed, and improved by said company, extending
from Windsor, in the State of Vermont, to Burlington, in said
State ; and also the stations, engine houses, shops, wood-houses,
iron, sleepers, and other appendages, with all the lands thereto
belonging, and intended for the use and accommodation of said
road, as they now are, and as they may be, if repaired and im-
proved, together with all the locomotives, engines, passenger,
freight, dirt, hand, and other cars, and all the other personal
property belonging to said company, as the same is now in use
by said company, or as the same may be heretofore changed or
renewed by said company." The first ground taken by the de-
fendants is, that this mortgage, being of the *franchise* of the cor-
poration, therefore, all property owned by them, whether con-
nected with the railroad or not, passes under the deed, though
not covered by the language of the description ; that, inasmuch
as a corporation cannot hold property, except by virtue of, and
in the exercise of, its franchises, a conveyance of its franchise
passes all its right to hold property. If this is the true view of
the nature and effect of this conveyance, then upon breach of the
condition of the mortgage, the corporation executing it came to
an end, or its existence is merged in, or devolved upon, the
mortgagees.

But, in our judgment, neither the Legislature nor the parties
contemplated any such consequences from the mortgage of a rail-
road, and it does not become necessary to give it a construc-
tion or effect involving any such result.

Corporations, created by act of the Legislature, are clothed
with a variety of privileges and powers, more or less extensive,
depending upon the terms of their charters, which are termed
franchises.

It is said that one of the franchises of all corporations is the
power of being a body politic, corporate existence, with rights
of succession of members. Another is its right of representa-
tion in court by its corporate name, either as plaintiff or defend-

ant. It has a general power, also, of acquiring, holding, and conveying property. In addition to these general corporate powers, this company was invested by the Legislature with a power to build a railroad between certain points, and to operate and manage the same, and take tolls and fares on the same for their own benefit and profit; and, to the extent of the proper necessities of the road, were authorized to exercise the sovereign power of the State to sequester private property without the consent of the owners, by making compensation therefor.

When a railroad company mortgages its road and appurtenances as a security for debt, and also its franchise, it is not to be understood as conveying its corporate existence, or its general corporate powers, but only the franchise necessary to make the conveyance productive and beneficial to the grantees, to maintain and support, manage and operate the railroad, and receive the tolls and profits thereof for their own benefit.

If it were held that all the corporate franchises, including the power of corporate existence, were conveyed by the mortgage, the conclusion would seem to be logical, that, on breach and foreclosure, the mortgagees would step into the shoes of the company and merely succeed to their rights in the property, and also to their corporate liabilities—a result by no means favorable to their interest. Or, if it were held that the mortgagees did not succeed to the corporate existence and functions of the Railroad Company, and that they did not remain in the company, then it must operate as a dissolution of the company, and lands taken compulsorily for their road, would revert to the owners in fee.

The construction we give the mortgage, relieves the case and the parties from the serious embarrassments which would arise from such a construction as the defendants claim for it, and leaves us to find what was really conveyed by the deed by the terms used in the description of the property.

The principal subject of the conveyance is the Vermont Central Railroad, and the language which follows is evidently designed to be merely a full description of the appurtenances and equipment of the road, and not words of enlargement to include more than belonged properly to it, and do not extend the conveyance, in fact, beyond what would be included in it by a

conveyance of the railroad, appurtenances, and equipment. The particular words, having reference to lands, are, "All lands thereto belonging, and intended for the use and accommodation of said road." The words, *thereto belonging*, refer not to the company, but to the railroad ; and this is made the more clear and distinct by the words which follow, " *intended for the use and accommodation of said road*," and, taken in connection with the object and principal subject of the grant, make it clear that it was not understood that any and all lands the company might own were conveyed, but only such as were connected with and properly formed a part of the railroad or its appurtenants.

Railroad companies in this State, by their charters, and by the general statutes of the State, are authorized to take all lands necessary for the construction and maintenance of their roads, and the convenient accommodation of the same, for procuring stone or gravel for the same, for depot accommodations, and for water for the use of the road, without the consent of the owners, by paying the appraised value thereof.

The charter of the Vermont Central Company provides that " the stock, property and effects of the company shall be exempt from all taxes levied by or under the authority of this State."— In the case of *The Vt. Central R. R. Co. v. Burlington*, 28 Vt. 193, the question arose, whether lands owned by the company, but not taken or used for railroad purposes, so that the company would have been authorized to take them by proceedings *in invitum*, were exempt from taxation ; and it was held that they were not. Some of the very lands now in controversy in this case, we understand to have formed the subject of the litigation in that case. Similar decisions have been made in Massachusetts, New Jersey, and Pennsylvania, as shown in the opinion of Isham, J., in the case above cited. In *Seymour et. al. v. Can. & Niagara F. R. R. Co.*, 23 Barb. 284, a mortgage was executed of a railroad partly built ; and it conveyed "the said railroad constructed, and to be constructed, together with all and singular the railways, rails, bridges, fences, privileges, rights, and real estate, now owned by said company, or which shall hereafter be owned by them." It was decided that the mortgage covered all such lands as were taken by the company for railroad purposes, which

they could take by compulsory proceedings under their charter, but did not extend to lands owned by the company purchased for other purposes. The language of the mortgage is not more extensive than the language of the charter and of the railroad law, and by no means so broad as the clause exempting the company's property from taxation.

We are of the opinion, therefore, that. the true test by which to determine whether any particular piece of the several parcels of land in dispute passed under the mortgage, is, whether it was so connected with, and used by, the company for the railroad, that they would have been authorized to take it compulsorily under the provisions of the charter.

It is not material of course, whether they did so obtain it, or by a purchase from the owner, but was it so situated that they would by law have been authorized to take it in that way? If so, then it would pass under the mortgage though obtained by purchase from the owner.

A question has been made in reference to some of the parcels of land which were originally purchased for legitimate railroad use, but where the purpose had been entirely abandoned before the execution of the mortgage; whether they are within the language of the mortgage, or " intended for its use, &c."

The language, as we think, refers to the time when the deed was executed, and not to the original intent of the company when they purchased, and lands originally designed, when purchased, to be used for the road or for depots grounds, but which, by change of location, or otherwise, became unnecessary for that purpose, and the design was abandoned, would not pass, while, on the other hand, lands properly appropiated to the use of the road, at the time of the mortgage, would pass, though not originally purchased for such purpose.

What has been said is sufficient to indicate our general views as to the rights of the orator under his levy, and the trustees under the mortgage, that the trustees are entitled by virtue of their mortgage, to hold all lands then taken and used for the road-bed or track, depot or station grounds, shops, freight houses, wood houses and yards, side tracks and turnouts, or any other kindred purpose, but that lands owned by the company not

Eldridge v. Smith et als.

appropriated to such purpose would not pass, but would be held by the orator under his levy. In applying these principles to the various parcels of land in question, in the first place, the trustees are entitled to hold under their mortgage, the full and entire surveyed line of rail road to its full extent, and wherever any of the orator's levies include any land within the surveyed limits of the road, as finally located, to that extent his levy must yield to the mortgage title.

The most important question as to amount, arises upon the parcel No. 3, in the Northfield factory property. It seems this was purchased by the company for the purpose of establishing a manufactory of cars, and that it was used for that purpose for a while, but abandoned before the date of the mortgage to the trustees. The works for *burnetizing* wood were not placed thereon till long after the date of the mortgage, nor were they in contemplation at the time.

Is an establishment for the manufacture of railroad cars a legitimate railroad purpose, so that the company would have a right to take land for it against the will of the owner? The defendants say, that as the company must necessarily have cars in order to carry on their business, therefore they must have the right to manufacture them, and have works for that purpose. But this argument proves too much. Railroads must have iron, in great quantities, for their track and other purposes. Does this authorize them to take ore beds and lands for forges and foundries, and manufacture their own iron? They must have wood, sleepers, and timber for depots, and large quantities of lumber of various kinds. Does this authorize them to take timbered lands, and sites for mills, against the will of the owners?

They must have glass, nails, paints, and many other things. Can they by compulsory measures provide themselves the means to manufacture them all? We think it very clear they cannot. If the company must manufacture their own cars or go without, then, doubtless, their manufacture would be regarded as a necessity of the railroad, but the manufacture of cars and engines is a distinct branch of mechanical industry, carried on wholly independent of any connection with railroads, and is a branch of business in which railroad companies do not usually engage at all; and in

this case it seems to have been quickly demonstrated, that it was better to rely on supplying themselves with cars by purchase from those whose legitimate business it was to make them.

Although railroad companies must have engines and cars, iron, lumber, wood, and many other things in large quantities, in order to build and operate their roads, it is supposed they can supply themselves as private persons do, by purchase in the ordinary way, and they are not created or designed to be independent of all other branches of industry and business in the country, but to be additional aids to their successful development. The companies must have shops for the repair of cars and engines, as they are so often needed, and as they cannot well be moved for repairs, nor can facilities be found for repairs in the country generally, but the company were already supplied with all necessary accommodations for repairs. We are of opinion that an establishment for the manufacture of cars is not a legitimate railroad necessity, so that the company could properly condemn land on which to erect one.

But however this may be, this purpose had been entirely abandoned at the time this mortgage was given, and we think the land which had been bought for that purpose, was not then connected in any way with the road, or intended for its use and accommodation, so as to be embraced by the decription in the mortgage.

We are of the opinion that the erection of dwelling houses to rent to their employees, is not so for the use and accomodation of the railroad, as to authorize the seizure of land upon which to erect them, under any circumstances.

The master reports that part of lot No 7, in Northfield, and lot No. 1, in Middlesex, have ever been used for piling wood, and are necessary for that purpose. This is a purpose for which the company have the right to take lands, and to the extent lands were used for that object, at the date of the mortgage, the mortgagees would be entitled to hold them.

In relation to lot No. 1, at Waterbury, it appears from the master's report, that it has ever been used by the company for the purpose of piling wood and lumber thereon, and was so at the date of the mortgage to the trustees, though the master

Eldridge *v.* Smith et als.

reports that he finds they have sufficient space besides this lot for that purpose, if economically used. An examination of the evidence in the cause, and that taken before the master, and the diagram of the engineer, employed by the master, of the lands at that station, however, has led us to doubt very much, whether sufficient room is really left at that station, without this lot. But however that may be, it appears that this lot was before and at the time of the mortgage appropriated to their use by the company, and when land is taken for a legitimate railroad use by the railroad company, the judgment of the officers of the road, unless clearly beyond any just necessity, is regarded as conclusive. *Hill* v. *West. Vt. R. R. Co.*, 32 Vt. 68. We hold therefore that the orator is not entitled to this lot by virtue of his levy. The views before expressed sufficiently indicate our judgment, as to the various parcels of land covered by the levy, beside those that have been specifically named. The *pro forma* decree of the chancellor is therefore reversed, and the case remanded to the court of chancery, with directions to enter a decree that the said trustees under said mortgages, within some time to be fixed by the chancellor, execute a deed of release and quit claim to the orator of all the lands covered by his levy. with the exceptions above indicated, which will be more fully noted in the formal mandate to that court.

As the trustees are acting in a *quasi* official character, and appear to have acted in good faith, and have prevailed in part, no costs will be allowed to the orator against them. The bondholders who have been made defendants, are to be dismissed without cost.