ST. LOUIS & S. F. R. CO. et al. v. CITY OF TULSA et al.

(District Court, E. D. Oklahoma. April 8, 1914.)

Equity No. 2031.

1. EMINENT DOMAIN (§ 274*)—REMEDIES OF OWNER OF PROPERTY—INJUNCTION TO RESTRAIN TAKING.

If the right of a municipal or other corporation to condemn property for a public use does not exist, injunction to restrain proceedings for such condemnation is the proper remedy.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 753, 765–768; Dec. Dig. § 274.*]

2. EMINENT DOMAIN (§ 47*)—PROPERTY SUBJECT TO APPROPRIATION—PROPERTY PREVIOUSLY DEVOTED TO PUBLIC USE—EXTENSION OF STREET ACROSS RAILROAD YARDS.

Under general statutes authorizing a city to condemn right of way over property or right of way previously acquired for a public use by any other corporation, where not inconsistent with the purposes for which the property was taken or acquired by the latter,.the city has no power to condemn right of way for the extension of a street across the station yards of a railroad company, however the land was acquired, upon which it maintains numerous tracks and switches for the moving and storage of cars, where such extension would necessitate the moving of switches and switch stands and leading tracks and compel the shortening of the yard tracks to the inconvenience of the company and the detriment of its business.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 107–12∩; Dec. Dig. § 47.*]

In Equity. Suit by the St. Louis & San Francisco Railroad Company and others against the City of Tulsa and others. On motion for preliminary injunction. Motion granted.

R. A. Kleinschmidt and Fred E. Suits, both of Oklahoma City, Okl., for complainants.

John R. Ramsey and John R. Woodard, both of Tulsa, Okl., for respondents.

CAMPBELL, District Judge. The question now presented arises upon application of the plaintiffs for a temporary injunction pending final decree to prevent the defendants from proceeding in the state court to condemn that portion of plaintiffs' right of way which would fall within the lines of Frankfort avenue·in the city of Tulsa if the same were extended across the plaintiffs' right of way.

By resolution of its commissioners, the city of Tulsa has provided for the extension of Frankfort avenue over plaintiffs' right of way and has directed its attorney to institute condemnation proceedings in the proper state court to condemn for the use of said Frankfort avenue so extended that portion of the plaintiffs' right of way falling within the same. It appears from brief of counsel for defendants that the charter of the city of Tulsa gives the city the right to condemn property for public purposes when deemed expedient whether such property be within or outside of the city. Among its other powers in the charter it has the right to extend streets. The charter further provides that the procedure for the condemnation of property by the city shall be governed and controlled by the state laws in force in reference to condemnation of right of way for railways, and the assessment of damages therefor; the city occupying, in such proceeding, the position of the railroad company. It does not appear that the charter specifically gives the city the right to condemn, for any. public use of the city, property already devoted to another public use; but it is provided in the charter that the city shall have and exercise all powers of municipal government not prohibited to it by the charter or by some general law of the state of Oklahoma or by the provision of the Constitution of the state. The charter further provides that all questions arising in administering the city government, not provided for in the charter, shall be governed by the state laws in such case made and provided. By section 599, Revised Laws of Oklahoma 1910, it is provided that cities may take private property for public use; but in such case the city shall make the person or persons whose property shall be taken qr injured thereby adequate compensation therefor, to be determined as provided by law for the condemnation of property for railway purposes. In sections 1400 to 1410, inclusive, of 1910 Revised Laws of Oklahoma, is found the procedure by which railway companies may condemn property for railway purposes, section 1404 of which reads:.

"The provisions of this article with reference to eminent domain shall apply to all corporations having the right of eminent domain, and all such corporations shall have the right, under the provisions of this article, to acquire right of way over, along or across the property or right of way of any other. such corporation, not inconsistent with the purposes for which such property

was taken or acquired. In all cases of condemnation of property for either public or private use, the determination of the character of the use shall be a judicial question; and the procedure shall be as provided herein: Provided, that in case any corporation or municipality authorized to exercise the right of eminent domain shall have taken and occupied, for purposes for which it might have resorted to condemnation proceedings, as provided in this article, any land, without having purchased or condemned the same, the damage thereby inflicted upon the owner of such land shall be determined in the manner provided in this article for condemnation proceedings."

It is clear from a reading of the foregoing section that municipal corporations fall within its terms, being, as we have seen, corporations having the right of eminent domain for certain purposes. It is also clear that the exercise by the city of the right of eminent domain over property of any other corporation having right of eminent domain, which property is already devoted to a public use, is limited to such taking as is not inconsistent with the purposes for which such property already devoted to public use was taken or acquired.

[1] Therefore, if the extension of Frankfort avenue across the plaintiff's right of way would be inconsistent with the purposes for which the plaintiffs acquired and are now using the right of way at that point, then it cannot be said that the city has the right to extend the street as it is proposed to do. If the right does not exist, then injunction is the proper remedy. 15 Cyc. p. 988; Lewis on Eminent Domain (3d Ed.) §§ 901, 902, and 918; High on Injunctions, § 597; C., R. I. & P. Ry. Co. v. Williams (C. C.) 148 Fed. 442, and cases cited.

[2] It is immaterial whether the railroad company's right of way was acquired by purchase or by regular condemnation proceedings. It is presumed to have been lawfully acquired by the railway company, and is actually devoted to and needed for the public use, within the legitimate exercise of its corporate franchises. The question for the court, when it arises in a judicial investigation of this character, is not how the land was acquired, but how it is used or whether it is necessary for a public purpose. Matter of Rochester Water Commissioners, 66 N. Y. 413. If the use to which the city will devote the property by the extension of the street is inconsistent with the use to which the railroad company is now devoting it, then the right of the city to extend the street across the right of way does not exist. Minnesota & St. Louis R. Co. v. Village of Hartland, 85 Minn. 76, 88 N. W. 423. The question of inconsistency involves the question as to whether the evidence shows that the opening of the proposed street will destroy or essentially impair the use of the right of way and depot grounds in question for the purpose to which they are now devoted. In Cincinnati, W. & M. R. Co. v. City of Anderson, 139 Ind. 490, 38 N. E. 167, 47 Am. St. Rep. 285, it is said:

"Immediately south of the projected street, parallel with said tracks and a part of said yard, the appellant owned ground upon which such water tank, coal dock, turntable and roundhouse could have been located, and, with changes in some of the side tracks mentioned, could have been used as conveniently and practically with the same advantages, excepting the necessity of keeping said projected extension free from standing cars, and the said added hazards by reason of the crossing and recrossing by the public of the appellant's tracks. * * * Under the general law permitting cities to es-

tablish streets, we have no doubt of the implied power to extend streets transversely across the right of way of a railroad, when in doing so the uses for which such right of way is employed are not materially injured or destroyed, and where such uses and those for a street may coexist without impairment of the first uses. But where such uses cannot so coexist, or where the first use is materially impaired or destroyed, it is well settled in this state and elsewhere that the second public use will be denied. Lake Erie & W. Ry. Co. v. Town of Boswell, 137 Ind. 336, 36 N. E. 1103; City of Ft. Wayne v. Lake Shore & M. S. Ry. Co., 132 Ind. 558, 32 N. E. 215 [18 L. R. A. 367, 32 Am. St. Rep. 277]; City of Seymour v. Jeffersonville, M. & I. R. Co., 126 Ind. 466, 26 N. E. 188; City of Valparaiso v. Chicago & G. T. Ry. Co., 123 Ind. 467, 24 N. E. 249; Railroad Co. v. Williamson, 91 N. Y. 552; In re City of Buffalo, 68 N. Y. 167; In re Boston & A. R. Co., 53 N. Y. 577; Railroad Co. v. Bronnell, 24 N. Y. 345; Milwaukee & St. P. Ry. Co. v. City of Faribault, 23 Minn. 167; Railroad Co. v. Muder, 49 Mo. 165; Mohawk & H. R. Co. v. Archer, 6 Paige [N. Y.] 83; St. Paul Union Depot Co. v. City of St. Paul, 30 Minn. 359, 15 N. W. 684; New Jersey Southern R. Co. v. Long Branch Com'rs, 39 N. J. Law, 28."

The court, in passing on the case, said:

"The theory of the appellee, and that adopted by the circuit court, is that such buildings and structures are not indispensable, for the reason that they may be conveniently located elsewhere, and, after relocation, the uses of the street and the railway may coexist. This theory is not new, but, if adopted by any of the adjudged cases, the fact has not been discovered by us. On the contrary, numerous cases have denied it. In Railroad Co. v. Kip [46 N. Y. 546, 7 Am. Rep. 385], supra, it was said: 'It is claimed that there are other lands in the same vicinity, equally adapted to the use of the applicant, as those sought to be acquired by these proceedings, and which possibly might be acquired by purchase from the owners. But such objections to these proceedings are untenable. The location of the buildings of the company is within the discretion of the managers, and courts cannot supervise it.' In New York Cent. & H. R. Co. v. Metropolitan G. L. Co., 5 Hun, 201, it was said: 'Upon the point that the lands proposed to be taken are not necessary, because it might be practicable for the respondents to lay their tracks upon their own lands, by adopting another curve, we are not prepared to concur with the applicant's counsel. It is not a question of possibilities, nor of strict practicabilities within the opinion of engineers. No route was ever surveyed for a railroad which was not open to such objections, and if the right to take lands was to be determined by the conflicting evidence, whether, after all, the tracks might not, with greater or equal convenience, be laid elsewhere, the construction of a road would be attended with the most serious embarrassments. Reasonable necessity must be shown, but a reasonable discretion must be allowed to the officer who locates the tracks of a railroad, for it cannot be presumed that the corporation is unnecessarily incurring heavy expenses in obtaining lands, when those it already has would answer its purpose.' In Eldridge v. Smith, 34 Vt. 484, it was held that: 'When land is taken for a legitimate railway use by the railroad company, the judgment of the officers of the road, unless clearly beyond any just necessity, is regarded as conclusive.' We may add that if roundhouses, water tanks, coal docks, or other necessary uses of a railway may be disturbed and relocated, or their location destroyed, it becomes a matter of extreme difficulty, if not an impossibility, to discriminate between such right and the right to require tracks to be removed for the benefit of other public uses; and further, if the removal of such buildings and structures may be required to appropriate their location to other public uses, it would be difficult to determine why depots should not be subject to the same rule. Another difficulty in adopting the theory contended for by the appellee is that the rule could not be made to depend upon the proximity of the old to the new location, for if the removal were required, and there were no ground for the new location in the immediate vicinity, public necessity, in pressing its demand for a street crossing, could insist with force that remote situations afforded equal or better facilities for

the convenient and safe employment of the uses sought to be superseded. Without legislative sanction, it is our opinion that such uses cannot be destroyed upon the mere discovery that they may be enjoyed at some place other than the point of their location."

In State (N. Y. & S. W. R. Co., prosecutor) v. Mayor of City of Patterson, 61 N. J. Law, 408, 39 Atl. 680, an ordinance of the city of Patterson provided for the extension of an avenue 70 feet wide through the freight yards of the railway company. These yards, a hundred feet in width, extended for a distance of 1,087 feet between two streets in the city already provided with grade crossings. The street proposed to be so extended would cross said yards about midway between the two existing streets. The railway company's freight house was located within these yards, as well as its freight yards and its main double tracks. It was used exclusively for such tracks and as a freight yard, the incoming freight being put on the side tracks and deposited there for consignees to go with their teams and remove it, and the sidings were built with special adaptation to that purpose. The company had no other yards or yard facilities in the city that could be used in place of these. The proposed street did not interfere with the freight depot but only crossed the several tracks at grade. It was held in that case that while the city charter only gave the city the general power to lay out, open, vacate, straighten, widen, or alter any street, and to take such lands and real estate as might be necessary therefor, upon making compensation in the manner provided, no special provision being made for taking the lands of the railroad company, there could be no doubt that under this general authority the state might lay out a street over the right of way of a railroad corporation, but that the case involved more than that. The court in conclusion said:

"The railroad company cannot be deprived of the beneficial use of its freight yard, and be constrained to transact its freight business elsewhere, unless clear authority is given to the city of Patterson to require it to do so. No such authority appears in this case, and it cannot be inferred from the general power given to lay out and open streets. Until the Legislature bestows such powers upon the municipality, the company cannot be compelled to abandon its freight yard, and seek another locality for the transaction of its daily business. The ordinance is without authority, and should be set aside."

As late as 1905 the Supreme Court of Appeals of Virginia, in the case of Richmond, R. & P. R. Co. v. Johnston et al., 103 Va. 456, 49 S. E. 496, had a similar question before it; the case presenting much the same physical conditions existing here, with the inconsistency of uses proposed not so strongly marked as it is under the facts presented in the case at bar. It is stated in the opinion that:

"The Richmond, Fredericksburg & Potomac Railroad Company and the Chesapeake & Ohio Railway Company operate lines of railroad from the city of Richmond, in a northerly direction, into and beyond the county of Henrico. A short distance beyond the city limits a public thoroughfare was constructed between the two roads, and it became desirable, with a view to its extension, to cross the tracks of the Richmond, Fredericksburg & Potomac Railroad. This company had purchased a parcel of ground from Lewis Ginter, containing about nine acres, for which it paid the sum of $6,714.75, and received a deed dated November, 1891, which was admitted to record on the

1st day of February, 1892. This plat of ground is 120 feet in width and 3,250 feet in length, and is adjacent to the original right of way upon which the principal tracks of the railroad company are laid, and the purpose was to lay down upon it switches and other conveniences for the storing of cars and making up and shifting of trains."

In a petition on behalf of the city for an extension of the highway in question, it was stated that it had become necessary to the public generally, in view of the fact that the railroad had blocked up a private road which had been used by the public generally for a long period of years as a convenient outlet for travel to and from certain portions of the county. The road was ordered opened by the lower court and appeal taken by the railroad company. The law applicable to such cases is well stated by the court in the following excerpt from the opinion:

"Two questions are presented for decision, the first, as to the propriety of the condemnation of the railroad property under the circumstances disclosed in this record, and, secondly, as to the adequacy of the compensation awarded.

"Section 1095 of the Code of 1887 provides that: 'Every railroad hereafter constructed across a county road, street, or other highway; and every county road, street or other highway hereafter constructed across a railroad shall, as far as practicable, pass at surface grade, or pass beneath or above any existing structure at a sufficient depression or elevation, as the case may be, with easy grades, so as to admit of safe and speedy travel over each.'

"Section 1096: 'At every existing crossing such as is mentioned in the preceding section, the grade of the work last constructed, to the full width of the railroad land, shall be made sufficiently smooth and level to admit of safe and speedy travel over such crossing. Where such improvement is to be made in a railroad, it shall be made by the corporation, company, or person operating the same. Where it is to be made in a county road, street, or other highway, it shall be made by the authorities having the control of such county road, street, or other highway and charged with the duty of keeping the same in order.'

"Acting under the authority conferred by these sections, the county authorities of Henrico seek to construct a public thoroughfare across the land of the railroad company, purchased for and devoted to the uses of a railroad yard, through which numerous trains engaged in freight and passenger traffic are passing, and in which engines are to be constantly employed in shifting cars and in making up trains. Under such conditions it would be well-nigh impossible to construct a crossing at surface grade so as to admit of safe and speedy travel, and it was therefore urged with much force that this consideration alone should defeat the petition for opening the road, as being inconsistent with proper regard for the safety of the traveling public, whether upon the proposed highway or along the railroad tracks.

"We shall not, however, rest the decision of the case upon that point. We do not question the power of the state, in the exercise of its right of eminent domain, to condemn land already condemned and appropriated to a public use. The general statute which we have quoted is ample authority for crossing a railway with a public highway, or a public highway with a railway; the safety of the public being carefully protected. But the better opinion seems to be that a general power of condemnation, such as is found in sections 1095 and 1096 of the Code of 1887, which authorizes the crossing of the tracks of a railway company by a highway, or of a highway by the tracks of a railway company, is insufficient to authorize the condemnation of property purchased and used by a railroad company for depots, stations, and railroad yards. The power to condemn any and all such property is recognized, but the authorities seem uniformly to hold that it must be exercised in obedience to a statute which specifically authorizes its condemnation, and that general language, such as is used in the sections we have quoted, is insufficient to that end.

"In Lewis on Eminent Domain (2d Ed.) p. 266, it is said: 'A general authority to lay out highways and streets is sufficient to authorize a layout across the right of way of a railroad. It makes no difference that the railroad company owns its right of way in fee. An authority to lay out a highway across the track of a railroad company is authority to cross all the tracks at any place. But, under a general authority to lay out highways, a part of the right of way of a railroad cannot be taken longitudinally, nor can the way be laid through depot buildings, and grounds, shops, and the like, which are devoted to special uses in connection with the road, and necessary to its operation and in constant use in connection therewith, and which would be materially impaired or destroyed by the taking. But the rule must receive a reasonable application, and a slight interference with the platform of a depot will not prevent the establishment of a highway.'

"In Elliott on Roads and Streets (2d Ed.) at section 218, it is said: 'The power to take property for public use is not restricted to property upon which the right has not been exercised, but it extends to property previously appropriated. Land which has been seized for one public purpose may be taken for another, whenever the public necessity requires. A street may be laid upon a turnpike or on a railroad, or a canal may be seized for that purpose. The Legislature has supreme power over the subject, limited only by the constitutional provisions, and, when it exercises this authority, the presumption is that the former use has become less beneficial to the public, and that the necessity of the public demands the appropriation of the property to the new use.'

"Section 219: 'The right of eminent domain is a dominant legislative power, only called into exercise by the enactment of a valid statute, and, when a party asserts a right to seize land previously appropriated to a public use, he must sustain his claim by producing a statute clearly conferring the asserted authority. It will not be presumed, in the absence of such a statute, that the Legislature intended to again seize property which had been once appropriated. The authority to take property seized and appropriated to another public use may be implied from the language of the statute, but this can only be so where the words employed and the evident intent of the statute make it clearly the duty of the courts to give force to the implication. The intent of the Legislature to destroy the rights granted by former statutes must unequivocally appear. A grant of authority to appropriate land seized under former statutes, or previously seized for public use, cannot ordinarily be inferred from a mere general grant. The general rule is that if the two uses are not inconsistent, and both may stand together without material impairment of the first, authority for the second use may be implied from a general grant; but, if they cannot coexist without material impairment of the first, authority to take for the second cannot be implied from a mere general grant of authority to condemn.' See, also, Dillon on Mun. Corp. par. 688.

"In this case it seems to be plain that the uses are inconsistent, and that they cannot stand together without a material impairment of the rights of the railroad company. The trains engaged in the transportation of passengers and freight over a great through line are of themselves so numerous as to render a crossing at grade extremely perilous. It is a matter of common knowledge that grade crossings are the cause of a large portion of the accidents which put life and property in jeopardy. How much more dangerous would be the passage along a broad thoroughfare or boulevard intended especially as a pleasure drive, which crosses at grade not only the ordinary business tracks of the railroad, but the numerous switches covering the yard of a railroad company used for storing and shifting its cars and making up its trains? It does not require the testimony of expert witnesses, for it is a matter of common knowledge that the use of the thoroughfare and of the railroad under such conditions would each be attended with constant and inevitable danger."

The court then cites approvingly Prospect Park & Coney Island R. R. Co. v. Williamson, 91 N. Y. 552; Matter of City of Buffalo, 68 N. Y. 167; Boston & Albany R. Co. v. Village of Greenbush, 52

N. Y. 510; Milwaukee & St. P. R. Co. v. City of Faribault, 23 Minn. 167; St. Paul Depot Co. v. St. Paul, 30 Minn. 359, 15 N. W. 684; Rochester Water Commissioners, 66 N. Y. 413; Yates v. Van de Bogert, 56 N. Y. 526. Concluding, the court say:

"The language employed in the sections of the Code relied upon as conferring authority to condemn the property in controversy is of a most general description. They obviously contemplate the crossing of tracks devoted to railway traffic, and not to property which railroads may lawfully, and must of necessity, acquire, such as depots, warehouses, yards for the shifting and making up of trains, and other like purposes incident to their duties. We repeat that we do not question the power of the Legislature to authorize the condemnation of the property in question for the purposes set forth in this record, but we are of opinion that no such power now exists, either by the express authority of the Legislature, or by necessary implication from any general power of condemnation for the construction of highways, and we think it may with much propriety be left with the Legislature to say whether or not Laburnum avenue should be permitted to cross the tracks and yard of the plaintiff in error at the point indicated, and, if so, under what limitations, restrictions, and conditions, in order that the public safety and convenience in the use of the avenue and of the railroad may be guarded and protected.

"Having reached the conclusion that there was no power to condemn in the case before us, it is, of course, unnecessary to discuss the question of compensation."

In Southern Kansas Railway Co. v. Oklahoma City, 12 Okl. 82, 69 Pac. 1050, was this situation: The railroad was constructed and the right of way and station grounds acquired under authority granted by act of Congress (Act July 4, 1884, c. 179, 23 Stat. 73). Section 9 of this act, among other things, provided that the railroad company should construct and maintain continually all road and highway crossings over the railway wherever the same had been then laid out, or might thereafter cross said railway's right of way, or might be by the proper authorities laid out across the same. First street in Oklahoma City, if extended across the railway company's right of way, would cross the same immediately north of the north end of the company's depot and station grounds, occupied at the time by a number of switch and passing tracks, as well as the passenger and freight depots. Within the lines of First street, as extended, there was a switch stand controlling three tracks lying upon said station ground. On the right of way affected by First street was also the main line of railway and a portion of an interlocking system made necessary by the crossing of another railway company's tracks immediately north of First street. Several blocks to the south of First street was California avenue, which the city also desired to extend across the right of way. California avenue, as extended, would pass through the station grounds, over the main track and a number of side tracks, and would also take in a portion of the passenger depot platform. Under authority of section 9 of the act above quoted, the city, by ordinance to that effect, sought to extend First street and California avenue across the right of way and compel the company to establish and maintain such crossings. The company refused to comply, and the city proceeded to open up the crossings, but injunction proceedings were begun by the railroad company. The trial court held that, as to First street, the

city had the right to proceed to open it up, but, as to California ave-
nue, the injunction should be granted. From the decision of that
court, as to First street, the railway company appealed. In passing
upon this case, the Supreme Court of Oklahoma territory said in
part:

"We think that section 9 of the act above quoted imposes a condition upon
the general grant, and the railway company accepted its grant subject to such
conditions, and it is the duty of such company, and it may be required by
the proper authorities, to open, construct, and maintain, at its own expense,
any highway or street crossings without condemnation proceedings, and with-
out compensation or claim for damages, whenever the same may be done
without destroying or materially impairing the use for which Congress grant-
ed their right of way. The right of the public to cross over the right of way,
roadbed, tracks, sidings, or other surface improvements is not so inconsistent
with the use granted to the railway company at points beyond the station lim-
its as to entitle the company to compensation or damages; such inconveni-
ences or burdens as are incident to the use of such crossings by the public the
company voluntarily assumed by the acceptance of the grant, and with the
express condition and limitation imposed by section 9 of said act. *  *  *
But, in our judgment, the provision of the act of Congress defining and im-
posing such conditions must be construed in connection with the purpose of
the general grant; and these provisions must be interpreted with reference
to the fundamental and paramount rights of eminent domain and due process
of law. The grant of the railway company is contained in sections 1 and 2,
and, by transposing and bringing the same together, will read as follows:
'That a right of way of one hundred feet in width through said Indian Terri-
tory is hereby granted for said main line and branch to the Southern Kansas
Railway Company, and a strip of land two hundred feet in width, and a
length of three thousand feet in addition to right of way, is granted for sta-
tions for every ten miles of road, with the right to construct, use and main-
tain such tracks, turnouts and sidings as said railway company may deem it
to their interests to construct along and upon the right of way and depot
grounds hereby granted.' It will thus be seen that Congress makes an ex-
press distinction between the 'right of way' and the 'depot grounds,' and gives
the railway company the right to 'construct, use, and maintain such tracks,
turnouts and sidings as said company deem it to their interests to construct
along and upon the right of way.' Pursuant to this grant, the company had
the unquestioned right, not only to construct its main tracks, but to con-
struct and maintain such turnouts and sidings, at any point on its right of
way, as it might deem expedient or to its best interests. And, in order for
the proper and ordinary operation and use of its turnouts, sidings, and switch-
es, it had the right to construct and erect, on such right of way, such switch
stands, posts, and other mechanical appliances as were necessary for a safe
and convenient operation of the turnouts and sidings.

"In imposing the condition that the railway company shall open, construct,
and maintain all necessary road and highway crossings, we do not think that
Congress intended that any of the company's property constructed and erect-
ed for its use, and within the terms of the grant, should be so appropriated
by such crossings as to destroy its use, or materially impair its use, for rail-
way purposes, without just compensation. A crossing may be constructed and
maintained across a railway right of way and over and across its roadbeds,
tracks, and sidings without destroying the use of the property or materially
impairing its use for railway purposes. It is true that the opening of a
street and extending a crossing over a railway company's right of way may
result in inconvenience to the railway company as well as the public; it may
occasion delays; it may require additional expenses to maintain gates and
flagmen; and it may be difficult to construct approaches, grades, and guards;
and yet the company cannot complain of any of these inconveniences or inci-
dental expenses which may result therefrom, because the company accepted
the grant subject to such conditions. And hence its grant is burdened with
these essential requirements, which are in the nature of police regulations;

when the proper public authorities deem it necessary to lay out a public road, highway, or street across the right of way; and these burdens must be borne without additional compensation. In our opinion, such uses by the public are not inconsistent with the prior uses granted the railway company, and the company and the public must enjoy the rights and privileges, and as a consequence must bear the additional expenses, burdens, and inconveniences resulting therefrom.

"This, then, is the general rule, but we think this general rule has a clear and well-defined limitation, which must be applied to the case at bar. This rule does not apply where the property of the company, which was properly constructed within the terms of its grant, for the operation of its tracks and sidings, will, by the laying out and extending of the street across such right of way, be destroyed or materially impaired, and thereby be required to be removed, and its use abandoned. We have already shown that the company had the right, by the express terms of its grant, to lay the sidings and turnouts at the point where the city proposes to open First street, and, if necessary, to operate such sidings and turnouts. It had the right to erect switch stands, and the necessary mechanism for operating the switches. The trial court specifically found that the opening of First street for travel will necessitate the shortening of the side tracks and turnouts, and the rearrangement of all the side tracks converging into First street. This, then, will, to the extent that the company is required to shorten its side tracks and turnouts and the rearrangement of the same, be not only a material impairment, but an actual destruction, of its property rights. The use of the crossing for a public street will therefore, to that extent, be inconsistent with the use to which the railway company has appropriated its right of way, within the terms of the grant, and to such extent, we think, it is an appropriation of private property for public use without just compensation, and is therefore forbidden by the fifth amendment to the federal Constitution, and was not contemplated by the conditions imposed in the grant, and is inconsistent therewith. * * *

"Since the facts as found by the trial court show that the construction of a street crossing at First street will necessitate a serious impairment or destruction or removal of valuable property of the railroad company, and of a character it had a right to construct under the express terms of its grant, we are of the opinion that, in so far as such will be the result, the impairment, removal, or destruction of such property without just compensation constitutes a taking of private property for public uses without just compensation, and is therefore in violation of the rights guaranteed to the company by the Constitution of the United States."

It is therefore seen that the Supreme Court of Oklahoma Territory held that notwithstanding the provisions of section 9 of the act under which the railway company secured its right of way, which required that it should establish and maintain at its own expense highway crossings over its tracks and right of way wherever highways existed at the time of the construction of the railway or might thereafter be laid out by proper authorities, this provision should be construed as only requiring this at places outside of its station grounds, and where such crossings, while resulting in more or less inconvenience and expense to the railway company, would not destroy or materially impair any portion of the railway property involved, and thereby require its removal or the abandonment of its use for the purposes to which it had been theretofore devoted. It was accordingly held that as to First street, inasmuch as the establishment of the highway crossing necessitated the removal of the switch stand and the readjustment of the tracks involved, the railway company was entitled to be compensated in damages therefor, and that the city must first make just compensation to the railway company for such damages, or proceed

by condemnation to have such damages ascertained. It was distinctly held also in this case that, because the extension of First street across the railway company's right of way necessitated the removal of the switch stand and the readjustment of the tracks which the railway company had rightfully established there, the use of that portion of the right of way for highway purposes was inconsistent with the public use to which the railway company had already devoted it.

The city of Tulsa has a population of probably 25,000 or 30,000. The main line of the Frisco railway to points in Oklahoma and Texas passes through the city, and that this railway company has an extensive business, with patrons at Tulsa and vicinity, is evidenced by the fact that there are more than 700 cars handled and switched in the yards there each day. To accommodate the switching, storage, and otherwise handling of cars there, the railway company has established yards extending from a point west of Main street to a point east of the proposed extension of Frankfort avenue. These yards cover a length of about eight or nine blocks, and are occupied by numerous storage, passing, switching, and transfer tracks, as well as the company's main line of railway, and its passenger and freight depots and platforms. From west to east, the yards are now crossed by Main street, Cincinnati avenue, and Elgin avenue, each open to both pedestrians and vehicles, and Boston avenue open to pedestrians. Frankfort avenue is one block east of Elgin avenue. At each end of the yards is what is known as a lead or ladder track, leading from the main line to the several tracks, constituting the yards as above described, a switch stand being necessary at each point in the ladder track where one of the yard tracks diverges from it. A portion of the ladder track on the west end is affected by the Main street crossing. In the vicinity of Main street and Cincinnati avenue is by far the most populous part of the city, and consequently by far the heavier street traffic. On account of this and the consequent interference and hazard arising therefrom, it is the custom of the railroad company to do at least 99 per cent. of its switching and shifting of cars to and from the several yard tracks over the lead or ladder track at the east end of the yards. The proposed extension of Frankfort avenue will cross the lead or ladder track at the east end of the yard and include two switch stands. The establishment of this street across the company's property will compel it to remove this lead or ladder track either to the east or the west. Because of a Santa Fé connecting track and the crossing of the Midland Valley, Missouri, Kansas & Texas, and the Frisco railways, a short distance east of its present location, this lead or ladder track cannot be successfully operated, if moved to the east. If moved to the west, it will considerably shorten the present yard facilities, and be so located that the handling of cars to and from the various yard tracks in the large number which the business of the company there requires will seriously conflict with the traffic upon the street, and is practically impossible without repeated violations of the ordinance of the city which prohibits the blocking of street crossings by trains for a period exceeding five minutes. The present yard facilities are inadequate for the busi-

213 F.—7

ness of the company, and, of course, to shorten the yards and reduce the storage and switching space would merely intensify this trouble. It will, of course, not be contended that the switch stands or the lead or ladder track can be successfully operated in the street. So far as they are concerned, it is manifest that if the street is opened up across the right of way, as desired by the city, they will have to be removed to another location, and, to that extent at least, the existence of the street will be inconsistent with the uses to which the railroad company is now devoting this property. No question is made, nor can be made, that this ladder track and the switch stands are necessary adjuncts to the railroad facilities for the handling of its business. The railroad company had a perfect right to place them where they are now, the matter of determining their location within the limits of the right of way is within the province of the proper officers of the company, in the exercise of their judgment as to where they will best serve the interest of the company in handling the business of its patrons, and presumably they were so located in the exercise of such judgment.

In view of the foregoing facts developed at the hearing in this case, I am clearly of the opinion that the public use, to which the portion of the railway company's property involved in this case is sought to be devoted by the city of Tulsa, is inconsistent with the public use for which it was acquired by the railway company and to which it is now devoted.

The temporary injunction prayed will therefore be granted, with injunction bond fixed in the sum of $5,000. Counsel may prepare and present order pursuant to this opinion.